UNITED STATES of America,
Plaintiff-Appellee,

v.

Grant H. ROYLANCE,
Defendant-Appellant.

No. 80–2239.

United States Court of Appeals,
Tenth Circuit.

Aug. 2, 1982.

Phil L. Hansen, Salt Lake City, Utah
(Steven L. Hansen, Salt Lake City, Utah,
with him on brief), for defendant-appellant.

---

* Honorable John W. Peck of the Sixth Circuit sitting by designation.

Harriet J. McFaul, Atty., Dept. of Justice, Washington, D. C. (Francis M. Wikstrom, U. S. Atty., D. Utah, Salt Lake City, Utah and William C. Bryson, Atty., Dept. of Justice, Washington, D. C., with her on brief), for plaintiff-appellee.

Before SETH, Chief Judge, and SEYMOUR and PECK *, Circuit Judges.

SEYMOUR, Circuit Judge.

Defendant Grant Roylance appeals a jury determination that certain of Roylance's entrepreneurial activities constituted mail fraud in violation of 18 U.S.C. § 1341, securities fraud in violation of 15 U.S.C. § 77q(a), and interstate transportation of monies obtained by fraud in violation of 18 U.S.C. § 2314. We affirm.

I.

The sad facts of this case lend credence to the worn homily suggesting the best way to double one's money is to fold it in half. A synopsis of those facts can be culled from the record appropriately considered in the light most favorable to the jury's verdict. *See United States v. Brinklow,* 560 F.2d 1008, 1009 (10th Cir. 1977).

Commencing in early 1977, Roylance offered investors from Utah and other states a "golden opportunity." He claimed to control a gold processing venture that purchased raw ore from miners in western Colorado, air-shuttled the ore to Las Vegas, Nevada, contacts for refining, and sold the resulting bullion to international metals traders. Roylance promised prospective investors that they would realize a 100% annual return on their monies, and indicated that he possessed sufficient personal assets to cover any funds deposited in the venture.

Interest in Roylance's gold scheme understandably developed. Utah residents invested substantial capital in the project. Early investors received distributions that Roylance denominated "interest", and some withdrew "principal" without difficulty. The venture then acquired a progressively

interstate flavor as word of Roylance's metallurgic wizardry spread. The Utah participants informed out-of-state friends of the project's apparent success, many of whom ultimately mailed money to Roylance for investment. Some of these new investors sent checks directly to Roylance while others transferred monies to him through their Utah contacts. Roylance successfully solicited additional out-of-state investments by personally traveling to California and detailing the virtues of his venture to west coast acquaintances.

Participants curious about the details of the purported gold project or the status of their investments received little information from Roylance. He refused to specifically identify either the source of the gold ore or the names of his alleged Nevada contacts. Roylance maintained that any such disclosure would compromise the security of his operation. He was similarly unenlightening regarding the existence of business records substantiating his gold venture and declined to allow investors to inspect any books. Roylance did provide some concerned participants with promissory notes representing the amount of their initial investments plus all accrued interest supposedly earned in the project.

The venture suddenly collapsed in 1978. Although Roylance continued to solicit and accept investments in his gold project, all interest payments and principal withdrawals ceased early that year. Participants found Roylance unwilling or unable to return monies deposited in the operation. Roylance informed participants that his gold venture had folded because his Nevada contacts had absconded with the entire three to four million dollars in pooled investment funds.

Significant trial evidence contradicted Roylance's representations concerning his alleged gold processing operation. Testimony revealed that: (1) a maximum of $34,000 in Colorado ore was purchased by Roylance between 1977 and 1978; (2) the ore was likely stolen; (3) interest payments to early venture participants actually came from funds deposited by later investors; (4) the only miner Roylance knew in Colorado died well before investor solicitation into the purported gold project ceased; (5) no gold ore was flown to Nevada by Roylance's pilots at any time; (6) no gold refinery existed anywhere in the Las Vegas area; (7) no telephone calls from Roylance's home or office were placed to any Nevada gold venture contacts; and (8) no evidence of any Nevada contacts was uncovered despite an FBI investigation into the matter. Roylance presented a "good faith" defense against this persuasive evidence, blaming his Las Vegas associates and relating a tale of mystery and intrigue replete with coded telephone calls, nocturnal rendezvous at freeway ramps, and alleged threats on his life.

## II.

Roylance raises four arguments for reversal of the verdicts against him. First, he asserts the prosecution failed to establish any use of the mails sufficient to convict him of mail fraud under 18 U.S.C. § 1341 and that the jury was improperly instructed on the issue. Second, he contends that the trial judge erroneously admitted evidence of other crimes in violation of Fed.R.Evid. 404(b). Third, he complains that insufficient evidence existed to overcome his defense of good faith. Fourth, he urges that the notes upon which his securities fraud convictions were based are exempt from the antifraud provisions of the proscribing statute, 15 U.S.C. § 77q(a).

### A. *Use of Mails*

Roylance contends that the previously described out-of-state investor mailings are inadequate grounds for his convictions under 18 U.S.C. § 1341.[1] Roylance theorizes

---

1. 18 U.S.C. § 1341 provides:
   "§ 1341. *Frauds and swindles.*
   "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation,

he did not "cause" the mailings within the meaning of the mail fraud statute because he had no personal contact with the nonresidents of Utah prior to their mailing him checks for investment in the venture, and that a jury instruction on specific contemplation of mail use was mandated. Additionally, Roylance submits the mailings were not in "execution" of the scheme to defraud as required by the statute inasmuch as they were performed by the investors. Neither of these claims is persuasive.

■ One causes mailings and triggers operation of 18 U.S.C. § 1341 when it is reasonably foreseeable his promotional activities will result in the use of interstate mails. *See United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 647, 38 L.Ed.2d 603 (1974); *United States v. Curtis,* 537 F.2d 1091, 1095 (10th Cir.), *cert. denied,* 429 U.S. 962, 97 S.Ct. 389, 50 L.Ed.2d 330 (1976). Whether that individual actually intends that his representations generate investments by mail from other states is not controlling. *See Pereira v. United States,* 347 U.S. 1, 9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954). "To establish that the several uses of the mail [are] caused by defendant it [is] sufficient to show that he set forces in motion which foreseeably would involve mail uses." *Marvin v. United States,* 279 F.2d 451, 454 (10th Cir. 1960). Consequently, Roylance's assertion that a jury instruction requiring a finding of specific contemplation of mail use as a prerequisite to guilt can be summarily rejected. *See United States v. Boscia,* 573 F.2d 827, 834 (3d Cir.), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978).

Roylance's conduct in this case satisfies the causation test. His representations of incredible returns on capital placed into the venture demonstrate a desire to stimulate widespread investor interest. Moreover, af-

ter the initial out-of-state checks were sent to Roylance for deposit in the gold project, it was clearly foreseeable that continued promotional efforts would result in frequent and continuing use of interstate mails by investors. Although some out-of-state checks were first transferred to Roylance through third parties who promoted the scheme to family and friends, Roylance remained the original source of inducements and the ultimate beneficiary of interstate investor largess.

The mailings were also in "execution of the fraudulent scheme" as required by the statute. *See United States v. Lynn,* 461 F.2d 759, 763 (10th Cir. 1972). A mailing is for the purpose of executing a fraudulent scheme when it "play[s] a significant part in enabling the defendant ... to acquire dominion over the [victim's money] ...." *Maze,* 414 U.S. at 401, 94 S.Ct. at 649. The out-of-state mailings were a critical step in Roylance's obtaining participants' funds and hence meet this statutory demand. That the non-Utah participants themselves performed the mailings does not preclude a finding that they were in execution of Roylance's scheme. *See United States v. Toney,* 598 F.2d 1349, 1353 (5th Cir. 1979).

### B. *Evidence of Other Crimes*

■ Roylance claims the trial judge erred by allowing the prosecution to introduce evidence concerning investors who were defrauded in non-interstate transactions. He claims that such material constituted evidence of "other crimes" excludable under Fed.R.Evid. 403 and 404(b).

Roylance misunderstands the nature of the proof regarding intrastate participants. The gravamen of the fraud counts against Roylance is that he engineered a bogus gold venture. Although the indictment targeted those investors defrauded by use of the

security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or

receives therefrom any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

mails in violation of 18 U.S.C. § 1341, the scheme harmed local investors in the venture as well. The prosecution's proof unmasking Roylance's fraud included testimony concerning these intrastate transactions. This did not constitute excludable "other crimes" evidence but proof highly probative of the existence of the very scheme generating the government's case. *See generally United States v. Amrep Corp.*, 545 F.2d 797, 800 (2d Cir. 1976). In view of the liberal policy regarding the admission of evidence to prove intent in mail fraud cases, we conclude the trial judge properly exercised his discretion in admitting the challenged evidence. *See United States v. Foshee*, 606 F.2d 111, 112–13 (5th Cir. 1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1036, 62 L.Ed.2d 766 (1980).

### C. Good Faith Defense

■ Roylance's suggestion that evidence of his good faith bars his fraud convictions is without merit. It is true that a defendant's good faith belief in his venture's economic soundness is a complete defense to mail fraud under 18 U.S.C. § 1341. *See Sparrow v. United States*, 402 F.2d 826, 828 (10th Cir. 1968). However, the issue is properly one for the factfinder's determination and appellate courts are bound to consider all evidence, inferences, and deductions relevant to that question in the light most favorable to the verdict. *See United States v. Curtis*, 537 F.2d at 1097. We have so reviewed the record here and conclude

that substantial evidence supports the jury's rejection of Roylance's good faith defense and fanciful explanation 'for the disappearance of close to four million dollars in investors' funds.

### D. Notes and Securities under 15 U.S.C. § 77q(a)

■ The challenge to Roylance's securities fraud convictions merits only brief mention. He erroneously contends that the promissory notes precipitating the verdicts against him are not subject to the antifraud regulations of 15 U.S.C. § 77q(a)[2] because those notes' maturation periods are less than nine months. Roylance bottoms this conclusion on an exemption from the requirements of the Securities Act of 1933 ("1933 Act"). That exemption indicates that:

> "(a) [e]xcept as hereinafter expressly provided, the provisions of this subchapter shall not apply to any of the following classes of securities:
>
> . . . .
>
> "(3) Any note . . . which has a maturity at the time of issuance of not exceeding nine months . . . ."

The maturity date exemption, however, is specifically inapplicable to securities fraud prosecutions. 15 U.S.C. § 77q(c); *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976). Moreover, the maturity exemption is traditionally limited to prime quality com-

---

**2.** Section 77q provides in pertinent part:

"(a) It shall be unlawful 'for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of *any untrue statement of a material fact or* any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

"(b) It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

"(c) The exemptions provided in section 77c of this title shall not apply to the provisions of this section."

mercial paper and generally does not extend to notes issued for investment security purposes. *See Zabriskie v. Lewis,* 507 F.2d 546, 550 (10th Cir. 1974). Accordingly, Roylance's attack on his securities fraud conviction is unavailing.

Affirmed.