**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

ARVIN WEISS,

        Defendant - Appellant.

No. 08-1477
(D. Colorado)
(D.C. No. 1:05-CR-00179-LTB-1)

---

**ORDER**

---

Before **KELLY**, **EBEL**, and **MURPHY**, Circuit Judges.

---

This matter is before the court on appellee's motion to publish the court's decision of July 27, 2010. Upon consideration, the motion is granted. Attached to this order is a revised opinion for publication.


Entered for the Court,


ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

July 27, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ARVIN WEISS,

      Defendant - Appellant.

No. 08-1477

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:05-CR-00179-LTB-1)**

---

Steven Alan Reiss, Weil, Gotshal & Manges LLP, New York, NY (Lisa R. Eskow and Arthur C. D'Andrea, Weil, Gotshal & Manges LLP, Austin, TX, with him on the briefs), for Defendant-Appellant.

Linda S. Kaufman, Assistant United States Attorney (David M. Gaouette, United States Attorney and Andrew A. Vogt, Assistant United States Attorney, with her on the brief), Denver, Colorado, for Plaintiff-Appellee.

---

Before **KELLY**, **EBEL**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I.    INTRODUCTION

Following a three-week jury trial, Arvin Weiss was convicted of eight counts of mail fraud and aiding and abetting in violation of 18 U.S.C. §§ 1341 and 2(a), five counts of wire fraud and aiding and abetting in violation of 18 U.S.C. §§ 1343 and 2(a), and three counts of witness tampering and aiding and abetting in violation of 18 U.S.C. §§ 1512(b)(3) and 2(a).  In this appeal, Weiss argues the evidence presented at trial was insufficient to support his convictions. As to the mail fraud counts, Weiss argues the charged mailings—deeds of trust sent from the Denver County Clerk and Recorder to the lenders—were not sufficiently essential to his scheme to be actionable as mail fraud.  As to the wire fraud counts, Weiss argues the charged wire transmissions—internet communications from mortgage brokers to the Federal Housing Authority ("FHA")—did not meet the causation requirement of the wire fraud statute.  As to the witness tampering counts, Weiss argues the evidence was insufficient to support the "corruptly persuade" element of the witness tampering statute and the witness tampering counts were improperly charged because they allowed the jury to convict Weiss if it found he merely persuaded witnesses not to talk to investigators.  Finally, Weiss also challenges his sentence, arguing the district court both violated the Ex Post Facto Clause by applying the 2007 Sentencing Manual to all of his offenses and erred by applying the sophisticated means

enhancement. Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, this court **AFFIRMS** Weiss's convictions and sentence.

## II.    BACKGROUND

On September 27, 2005, Weiss, a Colorado real estate broker, was indicted on several counts of mail fraud, wire fraud, and witness tampering. The indictment alleged Weiss organized a scheme to obtain mortgage loans for low-income, unsophisticated home buyers through an FHA program sponsored by the United States Department of Housing and Urban Development ("HUD"). In furtherance of this scheme, Weiss helped borrowers obtain subsidized loans through the FHA's Single Family Home Mortgage program[1] even though they were ineligible, provided lenders with false information about the buyers, and paid the buyers' down payments in violation of HUD rules.

The charged mailings in the mail fraud counts were recorded deeds of trust sent from the Denver County Clerk and Recorder to the lenders involved in the various home sales which comprised Weiss's scheme. Each lender required its closing agent to have a deed of trust executed at the closing, and required the deed of trust to be promptly recorded and sent to the lender. The lenders needed

---

[1]The FHA's Single Family Home Mortgage program is designed to help low-income buyers obtain home mortgages. The program offers attractive interest rates and low down payments, and accepts alternative forms of credit from applicants who have weak or no conventional credit histories.

these original recorded deeds of trust to facilitate the smooth securitization and marketing of the mortgages in the secondary market.

Representatives from several lenders, as well as the Government National Mortgage Association ("Ginnie Mae"), testified as to the importance of these recorded deeds of trusts in marketing FHA loans in the secondary mortgage market. A manager at Old Kent Mortgage testified federally insured loans were particularly attractive to lenders because they could easily be sold to Ginnie Mae to generate funds for future loans. The manager also testified lenders needed the original recorded deeds of trust to meet Ginnie Mae's certification requirements, and that lenders such as Old Kent tried to avoid any deviation from this practice.

A representative from Union Planters Bank similarly testified it was required by Ginnie Mae to have the original recorded deeds of trust to market the loans in the secondary market. The representative testified Union Planters would make every possible contact to get the original recorded deeds of trust, including contacting the title company and the mortgage broker.

Finally, an account executive for Ginnie Mae testified Ginnie Mae required the original recorded deeds of trust to perfect its interest in the mortgage so that in the event of default, Ginnie Mae could file a claim with the FHA. The account executive stated Ginnie Mae would request the original deed of trust if the lender failed to produce it, but would also accept a certified copy if the original was lost.

Nevertheless, the Ginnie Mae representative highlighted that prompt receipt of the original deed of trust improved the marketability of the loans.

The charged transmissions in the wire fraud counts were internet messages sent by a loan processor in Colorado to the FHA in Maryland, requesting an FHA case number in connection with the FHA loan for a property in Weiss's scheme. The initial step in every application for an FHA-insured loan is the generation of an FHA case number. The evidence at trial established that Weiss sought out FHA-approved loan brokers for several reasons: (1) his buyers would not qualify for conventional loans, (2) FHA loans required smaller down payments, and (3) FHA loans were readily marketable in the secondary market. Indeed, all of the loans in Weiss's scheme were federally insured and funded by direct endorsement lenders with ongoing sponsor/correspondent relationships with local, FHA-approved mortgage brokers or the companies for which the FHA-approved brokers worked.

In addition, the jury heard evidence from which it could infer Weiss intended to procure FHA-insured loans. Weiss was an experienced, licensed real estate broker. At the time the charged transmissions took place, Weiss already had several years of experience in transactions involving FHA loans. When seeking to develop relationships with mortgage brokers, Weiss specifically held himself out as a FHA-approved real estate broker who was looking for an FHA-approved mortgage broker. As a real estate broker, Weiss had access to the

buyers' credit reports and knew many prospective buyers would have difficulty qualifying for loans. Nevertheless, he realized they could qualify for FHA-insured loans because he knew the HUD accepted alternative forms of credit documentation. To this end, Weiss generated fraudulent credit letters to include in the loan application packages, often without the borrower's knowledge, that specifically catered to the HUD's requirements for FHA loans.

Finally, as to the witness tampering charges, the jury heard evidence that Weiss, through his translator and co-defendant Jesus Guevara, told a number of the buyers not to reveal the true source of their down payments to investigators, and to tell investigators they had used their own funds to make the down payments. Three buyers in Weiss's scheme, Sergio Nunez, Fernando Salazar, and Edgar Torres, each testified Weiss told them to lie about the true source of the down payments.

Following a three-week jury trial, Weiss was convicted of eight counts of mail fraud and aiding and abetting in violation of 18 U.S.C. §§ 1341 and 2(a); five counts of wire fraud and aiding and abetting in violation of 18 U.S.C. §§ 1343 and 2(a); and three counts of witness tampering and aiding and abetting in violation of 18 U.S.C. §§ 1512 (b)(3) and 2(a). On December 2, 2008, the district court sentenced Weiss to eighty-four months on each of the witness tampering counts and sixty months on each of the mail and wire fraud counts, all to be served concurrently.

Weiss appeals, arguing there was insufficient evidence to support his mail fraud, wire fraud, and witness tampering convictions. Further, he argues the witness tampering counts impermissibly involved allegations of lawful conduct. Finally, he also challenges his sentence, asserting the district court's use of the 2007 Guidelines Manual violated the Ex Post Facto Clause and its application of a two-level sophisticated means enhancement was error.

## III. ANALYSIS

### A. Sufficiency of the Evidence

Sufficiency of the evidence challenges are reviewed de novo "to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Flanders*, 491 F.3d 1197, 1207 (10th Cir. 2007).[2] In making this determination, this court "will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury." *United States v. Gallant*,

---

[2]The "waiver rule" requires "a defendant who moved for a judgment of acquittal at the close of the government's case to move again for a judgment of acquittal at the close of the entire case if he thereafter introduces evidence in his defense." *United States v. Gallant*, 537 F.3d 1202, 1222 (10th Cir. 2008) (quotation omitted). In this case, Weiss made a Rule 29 motion following the close of the government's case with respect to two of the mail fraud counts and one of the witness tampering counts. Weiss, however, failed to renew his motions at the close of the entire case. Accordingly, this court reviews his sufficiency of the evidence claims for plain error. *Id.* at 1223. In the context of a sufficiency of the evidence claim, however, the plain error standard is "essentially the same" as the usual de novo standard. *Id.* (quotation omitted).

537 F.3d 1202, 1222 (10th Cir. 2008) (quotation omitted).  Rather, this court "evaluate[s] the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole."  *Id.* at 1223 (quotations omitted).

### 1.    Mail Fraud

The federal mail fraud statute, 18 U.S.C. § 1341, prohibits the mailing of any matter for the purpose of executing "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses."  The federal mail fraud statute reaches only "instances in which the use of the mails is a part of the execution of the fraud."  *Schmuck v. United States*, 489 U.S. 705, 710 (1989).  To be actionable as mail fraud, however, use of the mails "need not be an essential element of the scheme, as long as it is incident to an essential part of the scheme or a step in the plot."  *United States v. Cardall*, 885 F.2d 656, 680 (10th Cir. 1989) (quotations and citation omitted).  Indeed, routine mailings may supply the basis for a mail fraud conviction even if they contain no false information.  *Schmuck*, 489 U.S. at 715.  The relevant inquiry is whether the mailing was "part of the execution of the scheme as conceived by the perpetrator at the time."  *Id.*  Nevertheless, there is no requirement that the perpetrator personally effect the mailing.  *Pereira v. United States*, 347 U.S. 1, 8-9 (1954).  Rather, it suffices if the perpetrator "does an act with knowledge that the use of

-9-

the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." Id.

The eight charged mailings at issue were deeds of trust sent from the Denver County Clerk and Recorder to the lenders designated on the deeds. On appeal, Weiss argues the charged mailings were insufficient to support a mail fraud conviction because they were not "part of the execution of the scheme as conceived by the perpetrator at the time," as required by *Schmuck*, and because they were post-fruition mailings which had no effect on the ongoing viability of his scheme. The evidence at trial, however, was sufficient for a reasonable jury to convict Weiss based on the charged mailings.

Weiss's argument that the mailings were not "part of the execution of the scheme as conceived by [him] at the time" rests on his assertion that he was not involved in the actual mailings of the deeds of trust or the marketing of the loans in the secondary mortgage market. *Id.* Weiss's lack of involvement with the actual mailings of the deeds of trust (and the downstream securitization transactions they facilitated) is immaterial if Weiss knew the mailings would "follow in the ordinary course of business" or could "reasonably be foreseen." *Pereira*, 347 U.S. at 9. Weiss does not argue the mailings at issue here were not reasonably foreseeable by someone with his level of knowledge about real estate transactions. Even if Weiss had made this argument, the evidence presented was sufficient for the jury to reasonably conclude Weiss could have reasonably

foreseen deeds of trust would be mailed to the lenders after closing. Weiss was an experienced, licensed real estate broker. He had several years of experience working with FHA-insured loans, and attended numerous closings. Weiss's level of knowledge about real estate transactions in general, and the particular scheme at issue here, certainly allowed the jury to reasonably conclude Weiss could have reasonably foreseen the mailings would occur. Accordingly, his lack of involvement in the physical dispatch of the deeds of trust from the recorder's office to the lenders and his lack of involvement in the secondary mortgage market are irrelevant.

Furthermore, a jury could have reasonably concluded Weiss's scheme did not involve a series of independent frauds which reached fruition after the completion of each home sale. A scheme is not necessarily limited to each individual fraudulent act. *See United States v. Massey*, 48 F.3d 1560, 1566 (10th Cir. 1995) ("[A] 'scheme to defraud' has a wider meaning than an individual act of fraud."). Rather, "[a] scheme refers to the overall design to defraud one or many by means of a common plan or technique." *Id.* Based upon the evidence presented at trial, the jury could have reasonably concluded Weiss operated an ongoing, long-term scheme, many aspects of which were interrelated from transaction to transaction, and that each of the charged mailings was part of Weiss's overall scheme, rather than post-fruition surplusage.

Finally, a jury could also have reasonably concluded the charged mailings were "necessary in maintaining the ongoing viability of the fraud" because of their beneficial effect on the downstream marketability of the FHA-insured loans. *Cardall*, 885 F.2d at 682. Although there was no testimony directly addressing whether the scheme could have continued without the mailings, such an inference was reasonable in light of the evidence presented. The evidence revealed lenders required their closing agents to have the deeds of trust executed at the closing, and required the deeds of trust to be promptly recorded and sent back to the lender. The evidence further established lenders preferred original copies of these recorded deeds of trust to facilitate the smooth securitization and marketing of the mortgages in the secondary market. Representatives from several lenders testified Ginnie Mae, the primary guarantor of FHA-insured loans, required lenders to provide the original deeds of trust to meet its certification requirements. A representative from Ginnie Mae testified Ginnie Mae required the original recorded deeds of trust to perfect its interest in the mortgage in the event of default. This evidence at trial highlighted the important role the deeds of trust played in insuring the marketability of FHA-insured loans.

This ready marketability in turn enabled lenders to quickly sell their FHA-insured loans. The continued success of Weiss's scheme depended on his relationships with a small number of HUD-approved mortgage brokers, and their

relationships with HUD-approved lenders.[3]  These valued relationships were maintained through the appearance of legitimacy of Weiss's transactions, and the mailings of the original deeds of trust bolstered the legitimacy of these transactions from the lenders' perspective.  Consequently, although each mailing may not have been essential to complete the loan with which it was associated, each mailing was essential to the continuation of the scheme.  In its totality, the evidence was sufficient to allow a jury to reasonably conclude the charged mailings were indeed "incident to an essential part of [Weiss's] scheme." *Schmuck*, 489 U.S. at 711 (quotation omitted).[4]

## 2.    Wire Fraud

The wire fraud statute, 18 U.S.C. § 1343, prohibits transmissions "by wire, radio, or television communication in interstate or foreign commerce" for the purpose of executing a scheme to defraud.  On appeal, Weiss argues there was insufficient evidence that he "cause[d]" the internet transmissions on which the wire fraud convictions were based.  18 U.S.C. § 1343.  To establish the element

---

[3]For example, when one of the mortgage brokers entangled in Weiss's scheme lost his ability to get funding for FHA loans, Weiss's relationship with him ended.  Similarly, evidence indicated that one of Weiss's mortgage brokers went out of business after one of the HUD-approved lenders, National City Mortgage, terminated their business relationship because of the loan applications initiated by Weiss.

[4]Because the evidence was sufficient to demonstrate the charged mailings were incident to an essential part of Weiss's scheme and therefore actionable under the mail fraud statute, it is not necessary to decide the merits of the government's additional lulling and concealment theories.

of causation, the government must prove beyond a reasonable doubt Weiss had

actual knowledge that the wires would be used in the ordinary course of business

or that he reasonably should have foreseen such use. *Pereira*, 347 U.S. at 8-9;

*United States v. Roylance*, 690 F.2d 164, 166 (10th Cir. 1982) (holding the

causation element is met when the defendant "set forces in motion which

foreseeably would involve mail uses.").[5]

Weiss's wire fraud convictions rest upon five wire transmissions between

mortgage brokers and the FHA requesting access to the Computerized Home

Underwriting Management System ("CHUMS") to generate an FHA case number

for properties involved in Weiss's scheme. Weiss argues the government

presented no evidence demonstrating he either had actual knowledge the brokers

would send these transmissions in association with the loan applications or from

which a reasonable jury could conclude he should have reasonably foreseen such

transmissions.

The evidence presented at trial was sufficient to allow the jury to

reasonably infer Weiss intentionally applied for FHA-insured loans. Weiss was

---

[5]*Pereira v. United States* and *United States v. Roylance* addressed the causation requirement of the mail fraud statute, not the wire fraud statute. 347 U.S. 1, 8 (1954); 690 F.2d 164, 167 (10th Cir. 1982). Because the requisite elements of the two statutes are virtually identical, this court has held "[i]nterpretations of § 1341 are authoritative in interpreting parallel language in § 1343." *United States v. Lake*, 472 F.3d 1247, 1255 (10th Cir. 2007); *see also United States v. Redcorn*, 528 F.3d 727, 739 n.6 (10th Cir. 2008) (looking to the "law of the two statutes without differentiation").

an experienced, licensed real estate broker who had at least two years of experience in transactions involving FHA loans. Weiss had access to the buyers' credit reports, and knew many would have difficulty qualifying for loans. However, he knew they could qualify for FHA-insured loans because he knew the HUD accepted alternative forms of credit documentation. As a result, Weiss specifically sought to work with FHA-approved loan brokers. He provided these mortgage brokers with fraudulent credit letters that specifically catered to the HUD's requirements for FHA loans. Furthermore, all of the loans in Weiss's scheme were federally insured and funded by HUD-approved lenders who maintained sponsor/correspondent relationships with HUD-approved mortgage brokers with whom Weiss worked. This evidence was sufficient to allow the jury to reasonably infer Weiss intended to apply for FHA-insured loans.

A question remains as to whether the government met its burden of showing Weiss could have reasonably foreseen that these fraudulent applications for FHA-insured loans would cause the use of a wire transmission facility. There was no direct evidence Weiss had knowledge of the CHUMS system, or any knowledge of the specific protocols the mortgage brokers followed in processing the charged FHA loan applications. Weiss therefore argues he could not have reasonably foreseen the specific wire transmissions between the loan processors in Colorado and the FHA in Maryland. To establish causation, the government need not prove Weiss could have reasonably foreseen the specific wire

-15-

transmissions requesting access to the CHUMS system. Rather, the government need only prove Weiss could have reasonably foreseen that the fraudulent FHA applications would result in the use of a wire communications facility. *See, e.g.*, *Pereira v. United States*, 347 U.S. at 8-9 ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used."); *United States v. Ratliff-White*, 493 F.3d 812, 818 (7th Cir. 2007) ("To satisfy the causation element, the government need only show that the defendant knew that some use of the wires would follow. Our case law does not require that a specific mailing or wire transmission be foreseen."); *United States v. Pimental*, 380 F.3d 575, 589 (1st Cir. 2004) ("[I]t is simply the 'use of the mails' in the course of a scheme rather than the particular mailing at issue that must be reasonably foreseeable for the causation element of a mail fraud offense to be satisfied."); *United States v. Bortnovsky*, 879 F.2d 30, 38 (2d Cir. 1989) ("[W]hile [the defendants] may well not have anticipated that the adjuster would send the particular letter at issue, they undoubtedly could expect that the mails would be used to further and monitor their claim."); *United States v. Bruckman*, 874 F.2d 57, 60 (1st Cir. 1989) (holding the causation element was met by "evidence from which the jury could conclude . . . that some use of the

mails was to be anticipated in the course of [the defendant's] scheme").[6]

Accordingly, to establish the element of causation, the government need not prove Weiss had knowledge the specific wire transmissions charged in the indictment would follow in the ordinary course of business or that those transmissions were reasonably foreseeable. Rather, the government need only prove Weiss had knowledge of or could reasonably foresee that his fraudulent FHA applications would result in the use of a wire communications facility.

Under the facts of this case, it was reasonable for the jury to conclude Weiss could have reasonably foreseen that wire communication facilities would be used to process his fraudulent applications for FHA-insured loans. Weiss regularly engaged in real estate transactions in his capacity as a licensed real estate broker. These transactions often involved out-of-state underwriters and

_____

[6]This understanding of the causation element is reflected in the jury instructions given, which explained,

> To "cause" interstate wire communications facilities to be used is to do an act with knowledge that the use of the wire facilities will follow in the ordinary course of business or where such use can reasonably be foreseen even though one does not intend or request the wire facilities be used. It is the use of the wire communications facility that must be reasonably foreseeable, not the specific wire transmission or the interstate nature of the wire transmission.

Weiss did not object to this jury instruction, and cites no case law which supports the proposition that the government must prove the specific transmission in the indictment was reasonably foreseeable to the defendant. Nor does he argue the government's approach resulted in an impermissible variance from or constructive amendment to the indictment under the facts of this case.

lenders. Weiss regularly generated credit reports on potential buyers, and knew the FHA loan applications he submitted would result in the generation of additional credit reports. All of the evidence presented at trial regarding the generation of credit reports indicated wires were used in the process. Further, other evidence indicated Weiss's mortgage brokers often called him after pulling a borrower's credit report to inform him of any problems with the credit report or if the underwriters had additional requirements for a particular borrower. In addition, at each closing, Weiss signed a HUD settlement form which detailed the various funds that would be transferred at closing. These funds would generally arrive by wire, often from out-of-state underwriters.[7] In sum, this evidence allowed the jury to reasonably conclude Weiss could have reasonably foreseen that the use of wire communication facilities would follow in the wake of his fraudulent applications for FHA-insured loans.

### 3. Witness Tampering

The federal witness tampering statute makes it unlawful to "corruptly persuade[] another person, or attempt[] to do so . . . with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1512(b)(3). The "corruptly persuades"

---

[7]The underwriting offices relevant to the transactions at issue in the wire fraud counts, for example, were all out of state.

element of the witness tampering statute "requires the government to prove a defendant's action was done voluntarily and intentionally to bring about false or misleading testimony or to prevent testimony with the hope or expectation of some benefit to the defendant or another person." *United States v. Baldridge*, 559 F.3d 1126, 1143 (10th Cir. 2009) (quotation omitted); *see also United States v. Khatami*, 280 F.3d 907, 913 (9th Cir. 2002) (holding non-coercive encouragement to lie falls within the reach of § 1512(b)); *United States v. Farrell*, 126 F.3d 484, 488 (3rd Cir. 1997) (noting "attempting to *persuade* someone to provide *false* information to federal investigators" is punishable under § 1512(b)).

The evidence at trial showed that Weiss, through his codefendant Jesus Guevara, asked three witnesses to lie to investigators about the true source of the down payments on the loans at issue in Counts 14-16. This evidence, viewed in the light most favorable to the government, is sufficient to establish the "corruptly persuades" element of § 1512(b)(3). As to Count 14, Sergio Nunez testified Weiss told him "there were some investigators that were going around asking questions whether they had paid for the down payment . . . and that if asked I should say that I had made the down payment." As to Count 15, Fernando Salazar testified that Weiss, through Guevara, told Salazar he should tell anyone who asked that Salazar himself was the source of the down payment, which was a lie. Finally, as to Count 16, Edgar Torres testified he was told by Weiss to tell anyone who asked that the down payment came from Torres's employment or

savings.  The evidence at trial established Weiss's conduct fell within the ambit of § 1512(b)(3) and was therefore sufficient to support the jury's verdict.

Weiss additionally argues the witness tampering counts were improperly charged because they allowed the jury to convict him of persuading the witnesses to exercise their Fifth Amendment right to withhold self-incriminating information.  Specifically, he argues Count 15 is insufficient because it charges only that he attempted to persuade Salazar "not to say anything to investigators." In addition, he argues Counts 14 and 16 are equally defective because, as charged, the jury could convict Weiss either if it found he persuaded witnesses to lie about the source of the down payment or if it found he persuaded the witnesses "not to talk to investigators."

Weiss did not challenge the sufficiency of the indictment below.  Thus, this court reviews Weiss's claim only for plain error.  *United States v. Barrett*, 496 F.3d 1079, 1091-92 (10th Cir. 2007).  "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial  rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (en banc) (quotation omitted).

As to Counts 14 and 15, even assuming there was an error that is plain, Weiss cannot demonstrate that this error affected his substantial rights.  "An error only affects substantial  rights when it is prejudicial, meaning that there is 'a

-20-

reasonable probability that, but for the error claimed, the result of the proceeding would have been different.'" *United States v. Algarate-Valencia*, 550 F.3d 1238, 1242 (10th Cir. 2008). As the government points out, there was no evidence presented at trial indicating Weiss told Nunez and Salazar, the witnesses at issue in Counts 14 and 15, not to talk to investigators. Rather, the evidence at trial established Weiss told both buyers to lie about the source of the down payment. The jury could only have convicted Weiss upon the testimony of both Nunez and Salazar that Weiss told them they should lie if asked about the source of the money for their down payments, and should specifically say they made the down payments with their own money. Accordingly, Weiss's challenges to Count 14 and 15 of the indictment fail because he cannot show any error affected his substantial rights.[8]

Edgar Torres, the witness at issue in Count 16, on the other hand, testified Weiss attempted to persuade him to tell investigators: (1) he "didn't know anything"; (2) he "shouldn't say anything" regarding the purchase of the house; and (3) if asked, he should say the down payment "came from [his] employment or savings, or something." Other circuits have held that requesting a witness to

---

[8]Weiss suggests, for the first time in his reply, that the evidence at trial created a variance because the indictment charged him with corruptly persuading Salazar "not to say anything," and the evidence at trial revealed that Weiss's corrupt persuasion involved telling Salazar to lie to investigators. This court does not consider arguments raised for the first time in a reply brief. *See United States v. Murray*, 82 F.3d 361, 363 n.3 (10th Cir. 1996).

withhold information from investigators is insufficient to support a conviction under § 1512(b). *See Farrell*, 126 F.3d at 489 ("[M]ore culpability is required for a statutory violation than that involved in the act of attempting to discourage disclosure in order to hinder an investigation."). If the jury instructions had left open the option of convicting Weiss solely based on his attempt to persuade Torres not to talk to investigators, this court would be required to determine whether such conduct was legally sufficient to support a conviction under § 1512(b). *See Griffin v. United States*, 502 U.S. 46, 57-59, 59 (1991) ("When . . . jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error."). The jury instructions, however, foreclosed the jury from relying on this potentially inadequate legal theory.

Jury Instruction 24 stated the government must prove beyond a reasonable doubt "[Weiss] corruptly persuaded or attempted to corruptly persuade [Torres]." The instruction also explained "[o]nly persons conscious of wrongdoing can be said to knowingly corruptly persuade." Juries are presumed to follow the instructions they are given. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). The instructions here foreclosed the possibility the jury convicted Weiss of innocently persuading Torres to exercise his constitutional right to remain silent. Further, Torres testified Weiss instructed him not only to remain silent, but to lie and tell investigators he "didn't know anything" and, if asked, to tell them that he himself

-22-

provided the down payment. In light of the evidence presented and the jury instruction given, Weiss cannot establish the language of the indictment pertaining to his witness tampering convictions satisfies the plain error standard.

## B. Sentencing Issues

### 1. Ex Post Facto Clause

Weiss contends the district court's use of the 2007 Guidelines Manual violates the Ex Post Facto Clause. He argues the district court should have applied the 2000 Guidelines Manual to his convictions because all of the conduct charged in the mail and wire fraud counts occurred before the 2001 Manual became effective. This court reviews de novo a challenge to the application of a sentencing guideline on the ground that the application violates the Ex Post Facto Clause. *United States v. Hargus*, 128 F.3d 1358, 1364 (10th Cir. 1997).

Under the one-book rule, "[t]he Guidelines Manual in effect on a particular date shall be applied in its entirety." USSG § 1B1.11(b)(2) ("The court shall not apply . . . one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual."). In particular, "[i]f the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." USSG § 1B1.11(b)(3). The Guidelines' commentary states this rule is to be followed "even if the revised edition results in an increased penalty for the

first offense."[9]  USSG § 1B1.11 cmt.  An exception, however, exists if the court determines use of a version of the Guidelines Manual in effect on the date the defendant is sentenced would violate the Ex Post Facto Clause.  USSG § 1B1.11(a) & (b)(1).

The Ex Post Facto Clause "forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred."  *Weaver v. Graham*, 450 U.S. 24, 30 (1981).  "[T]he central concern of the *ex post facto* clause is fair notice to a defendant that the punishment for a crime has been increased from what it was when the crime was committed." *United States v. Sullivan*, 255 F.3d 1256, 1262 (10th Cir. 2001).  At sentencing, an ex post facto violation occurs when the district court "applies a guideline to an event occurring before its enactment, and the application of that guideline disadvantages the defendant by altering the definition of criminal conduct or

---

[9]The commentary in the Guidelines, however, is not authoritative if "it violates the Constitution."  *United States v. Sullivan*, 255 F.3d 1256, 1259 n.2 (10th Cir. 2001).  Circuits are split as to whether § 1B1.11(b)(3) violates the Ex Post Facto Clause.  This circuit, as well as the Fourth, Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits, has concluded § 1B1.11(b)(3) does not violate the Ex Post Facto Clause.  *See United States v. Duane*, 533 F.3d 441, 449 (6th Cir. 2008); *United States v. Foote*, 413 F.3d 1240, 1249 n.5 (10th Cir. 2005); *United States v. Lewis*, 235 F.3d 215, 217-18 (4th Cir. 2000); *United States v. Vivit*, 214 F.3d 908, 919 (7th Cir. 2000); *United States v. Kimler*, 167 F.3d 889, 893-95 (5th Cir. 1999); *United States v. Bailey*, 123 F.3d 1381, 1402-07 (11th Cir. 1997); *United States v. Cooper*, 35 F.3d 1248, 1250-53 (8th Cir. 1994), *vacated*, 514 U.S. 1094 (1995), *opinion reinstated*, 63 F.3d 761 (8th Cir. 1995).  The Third and Ninth Circuits disagree.  *See United States v. Ortland*, 109 F.3d 539, 547 (9th Cir. 1997); *United States v. Bertoli*, 40 F.3d 1384, 1404 (3d Cir. 1994).

increasing the punishment for the crime." *United States v. Foote*, 413 F.3d 1240, 1249 (10th Cir. 2005) (quotation omitted).

This does not, however, prohibit a district court from considering pre-amendment conduct when sentencing a defendant pursuant to a revised Guidelines Manual. For example, in *Sullivan*, this court held there was no violation of the Ex Post Facto Clause when a revised Guidelines Manual was applied to all of the defendant's tax offenses, two of which occurred before the revised Guidelines Manual went into effect. *Sullivan*, 255 F.3d at 1262-63; *see also United States v. Duane*, 533 F.3d 441, 449 (6th Cir. 2008) (holding no ex post facto violation in the use of an amended version of the Guidelines where offenses grouped together for sentencing purposes were committed before and after the amended version went into effect). The *Sullivan* decision reasoned the defendant was on notice that "his three consecutive failures to file would be considered part of the same course of conduct and would collectively determine his sentence" pursuant to the Guidelines' grouping and relevant conduct provisions. *Id.* at 1263 ("[T]he grouping rules, enacted in 1987, provide warning to criminals that completing another criminal offense similar to one committed previously places them in peril of sentencing under a revised version of the Guidelines." (quotation omitted)); *see also United States v. Bailey*, 123 F.3d 1381, 1405 (11th Cir. 1997) ("[A] defendant knows, when he continues to commit related crimes, that he risks sentencing for all of his offenses under the latest, amended Sentencing Guidelines

-25-

Manual. Analogous to a continuous criminal offense, like conspiracy, the one-book rule provides notice that otherwise discrete criminal acts will be sentenced together under the Guidelines in effect at the time of the last of those acts.").

In this case, two of Weiss's witness tampering offenses occurred after the 2001 Guidelines Manual took effect. At sentencing, the district court used the 2007 Guidelines Manual because application of the 2001 and 2007 Guidelines Manuals resulted in identical guideline sentencing ranges. *See* §1B1.11(a) ("[T]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). Both parties agree the application of the 2007 Guidelines Manual disadvantaged Weiss by subjecting him to a higher sentencing range than the 2000 Guidelines Manual, which was in effect when Weiss committed all but the last two witness tampering offenses. Using the 2000 Guidelines Manual for the mail and wire fraud offenses would have resulted in an advisory guidelines range of 51 to 63 months, rather than the advisory guidelines range of 78 to 97 months calculated under the revised 2007 Guidelines Manual.[10]

The district court sentenced Weiss under the 2007 Guidelines Manual pursuant to § 1B1.11(b)(3) and the § 3D1.2(c) grouping rules. Section 3D1.2(c)

---

[10]The higher advisory guidelines range is a result of a four-level increase in the treatment of actual losses. Here, the court determined the actual loss to be $708,113.71. Under the 2000 Guidelines Manual, a loss between $500,000 and $800,000 increased the total offense level by ten. USSG § 2F1.1(b)(1) (2000). The 2007 Guidelines Manual, by contrast, requires a fourteen-level increase for a loss between $400,000 and $1,000,000. USSG § 2B1.1(b)(1) (2007).

provides for the grouping of counts "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustments to, the guideline applicable to another of the counts." USSG § 3D1.2(c) (2007). The commentary makes clear that counts must be "closely related" to be grouped under § 3D1.2(c). *Id.* § 3D1.2(c) cmt. n.5. But it also notes the propriety of grouping counts which qualify a defendant for a two-level obstruction of justice enhancement under § 3C1.1, with the counts pertaining to the defendant's underlying crime.[11] *Id.*

The district court concluded the witness tampering counts were appropriately grouped with the mail fraud and wire fraud counts in accordance with § 3D1.2. Specifically, the district court ruled the witness tampering counts were "directly related to and interrelated with" the mail and wire fraud offenses:

---

[11]Application Note 5 of the guidelines commentary specifically addresses what constitutes "a specific offense characteristic . . . or other adjustment" under USSG § 3D1.2(c). The Commentary provides the following two examples:

> For example, the guideline for bribery of a public official contains a cross reference to the guideline for a conspiracy to commit the offense that the bribe was to facilitate. Nonetheless, if the defendant were convicted of one count of securities fraud and one count of bribing a public official to facilitate the fraud, the two counts would not be grouped together by virtue of the cross reference. If, however, the bribe was given for the purpose of hampering a criminal investigation into the offense, it would constitute obstruction and under §3C1.1 would result in a 2-level enhancement to the offense level for the fraud. Under the latter circumstances, the counts would be grouped together.

USSG §3D1.2(c) cmt. n.5 (2007).

[O]nce Mr. Weiss learned that there was a federal investigation into his activities, both in terms of the counts of conviction and in terms of other conduct referenced by the government in its second amended addendum, or supplement, Mr. Weiss . . . went to a number of the buyers to tell them not to talk to federal investigators and certainly, don't tell them who provided the down payment money. The down payment money being a central concern because of Mr. Weiss' knowledge that the HUD requirements were clear and explicit that the buyer provide the buyer's own funds. It was a central facet of the ongoing criminal conduct running through all of the 41 property transactions relevant here that the buyers did not provide their own funds for down payments.

So in essence then the criminal tampering counts which occurred that implicate the 2007 edition of the Guidelines constituted merely a continuation of the fraud conduct, at least for purposes of analysis here, in terms of concealment.

Weiss does not argue the district court erred in grouping the mail and wire fraud counts with the witness tampering counts under § 3D1.2(c). Rather, he argues an ex post facto violation occurred because the crimes he committed, even if properly grouped, were "dissimilar." Weiss emphasizes *Sullivan* involved identical pre- and post-revision offenses, and therefore does not foreclose the possibility that otherwise properly grouped pre- and post-revision offenses may create an ex post facto problem if they are sufficiently dissimilar. Weiss's argument fails.

As noted, "fair notice to a defendant" is the central concern of the Ex Post Facto Clause. *Sullivan*, 255 F.3d at 1262. In this case, Weiss was on notice when he engaged in witness tampering that this post-revision offense would be grouped with his pre-revision communications fraud offenses pursuant to USSG §3D1.2(c)

-28-

and §3C1.1.  Further, he was on notice the revised Guidelines Manual would be applied to both his pre- and post-revision offenses pursuant to USSG § 1B1.11.  *See id.* (noting the grouping rules were enacted in 1987 and provide notice "to criminals that completing another criminal offense similar to one committed previously places them in peril of sentencing under a revised version of the Guidelines" (quotation omitted)).

The district court properly ruled that Weiss's offenses were "closely related" and properly grouped the counts under USSG § 3D1.2(c).  As noted by the district court, concealment of the true origin of the down payments was central to both Weiss's communications fraud and witness tampering offenses.  Further, the Guidelines specifically provide for the grouping of counts when "one of the counts embodies conduct that is treated as [an] . . . adjustment to [] the guideline applicable to another of the counts."  USSG § 3D1.2(c) (2007).  In this case, Weiss's witness tampering constituted an adjustment, under USSG § 3C1.1, to the guideline applicable to his mail and wire fraud counts.  Although *Sullivan* involved identical pre- and post-revision offenses, its reasoning applies with equal force to cases involving non-identical, but properly grouped offenses such as those at issue here.  *See Sullivan*, 255 F.3d at 1262-63.  Accordingly, the district court did not violate the Ex Post Facto Clause in applying the 2007 Guidelines Manual to Weiss's convictions.

## 2.    Sophisticated Means

Weiss also contends the district court erred in applying a two-level "sophisticated means" enhancement under USSG § 2B1.1(b)(9)(C) (2007). This court reviews the district court's application of the Guidelines to undisputed facts under a deferential standard. *United States v. Jones*, 530 F.3d 1292, 1305 (10th Cir. 2008). Section 2B1.1(b)(9)(C) provides for a two-level increase in the offense level of a defendant "[i]f . . . the offense . . . involved sophisticated means." USSG § 2B1.1(b)(9)(C). The commentary to § 2B1.1(b)(9)(C) defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* cmt. n.8(B).

The district court concluded the application of § 2B1.1(b)(9)(C) was appropriate in light of the intricate means Weiss used to execute and conceal his fraudulent scheme. Specifically, the district court described the intricate process Weiss used to conceal his funding of the down payments, noted the "remarkable" scope of Weiss's scheme, and adopted the government's arguments regarding the complexity of the calculations Weiss employed to ensure the loan-to-value ratios, mortgage-payment-to-income ratios, and total-fixed-payment-to-income ratios met the HUD's requirements.

Weiss's primary contention is that application of § 2B1.1(b)(9)(C) under the facts of this case would result in its application to nearly all frauds involving

mortgage transactions. Weiss relies upon *United States v. Rice*, in which this court reversed the application of a sophisticated-means enhancement because the defendant's scheme was no more sophisticated than an ordinary fraudulently filed tax return. 52 F.3d 843, 849 (10th Cir. 1995). *Rice*, however, addressed § 2T1.3(b)(2), an enhancement pertaining to tax offenses which applies only to "'conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case.'" *Id.* (quoting the commentary to § 2T1.3(b)(2)). Section 2B1.1(b)(9)(C), however, is not similarly constrained, and in any case, the facts demonstrate Weiss's scheme was indeed more sophisticated than "the myriad crimes within the ambit of § 2B1.1." *Jones*, 530 F.3d at 1307.

Weiss further argues evidence of a series of uncomplicated single steps does not suffice for a sophisticated-means enhancement. Weiss emphasizes the probation office's statement that Weiss's home sales "do not appear to be more complex than an ordinary real estate transaction," and the district court's observation that the individual acts committed by Weiss, when viewed in isolation did not seem to fall within the scope of § 2B1.1(b)(9)(C). The Guidelines do not require every step of the defendant's scheme to be particularly sophisticated; rather, as made clear by the Guidelines' commentary, the enhancement applies when the execution or concealment of a scheme, viewed as a whole, is "especially complex or especially intricate." USSG § 2B1.1(b)(9)(C) cmt. n.8(B) (2007); *see also United States v. Jenkins-Watts*, 574 F.3d 950, 962 (8th Cir. 2009) ("Even if

-31-

any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." (quotation omitted)); *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003) (concluding a credit card fraud scheme linking unelaborate steps in a coordinated way to exploit the vulnerabilities of the banking  system was "sophisticated").  The district court did not err in concluding Weiss's scheme, viewed as a whole, employed "sophisticated means."  Its application of a two-level enhancement under § 2B1.1(b)(9)(C) was therefore appropriate.

## IV.   CONCLUSION

For the reasons stated above, this court **AFFIRMS** Weiss's convictions and sentence.