**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 9, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

GERALD WAYNE SNOW, JR., a/k/a
Jerry Snow,

Defendant – Appellant.

No. 11-7002
(D.C. No. 6:09-CR-00081-JHP-2 )
(D. E.D. Okla.)

ORDER AND JUDGMENT[*]

Before **MURPHY**, Circuit Judge **HOLLOWAY**, Senior Circuit Judge, and **O'BRIEN**,
Circuit Judge.

This case is about fraud on lending institutions by home builders. It involves only

the application of the sentencing guidelines. Specifically, we address the district court's

determination of the amount of loss incurred and its application of a sophisticated means

sentencing enhancement. We affirm.

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

## I. BACKGROUND

Gerald Wayne Snow, Jr. (Snow) was a fireman and owner of two residential construction companies, C&J Homes and Snow Homes. His father, Gerald Wayne Snow, Sr. (Gerald) was the president of Storybook Homes, also a residential construction company. From 2003 to 2005, Storybook Homes platted and dedicated three housing subdivisions in Wagoner County, Oklahoma. Snow and Gerald built homes within these subdivisions. Then, with the help of Gaile Cates and Ayo Olaniyan (both employees of mortgage brokerage businesses), Snow and Gerald recruited individuals to purchase homes by offering to pay their down payments and closing costs and to give them cash back and/or pay off their outstanding debts after closing. To ensure the buyers would qualify for loans, Snow and Gerald (1) gave the buyers money to temporarily deposit into their bank accounts, artificially inflating their financial situation (the money was paid back after the lenders verified the funds), (2) prepared false loan applications overstating the buyers' income and assets, (3) provided at least one buyer a fictitious employment verification letter and (4) set up sham second mortgages, giving lenders the false impression that their companies were financing a portion of the purchase price with subordinated funds. However, Snow and Gerald told the buyers they would not be required to make payments on the second mortgages.

In numerous instances, Snow and Gerald provided buyers with cashiers' checks to make the down payment and pay closing costs. Since the cashiers' checks indicated they were purchased by the buyers, the closing documents misrepresented the source of the money. Cates and Olaniyan also artificially inflated the prices of the homes on the loan

application, allowing Snow and Gerald to obtain loan proceeds in an amount greater than the true purchase price. After closing, they would use part of the loan proceeds to pay cash back to the buyers and/or pay off the buyers' outstanding debts. These payments were not reported to the lender. They would also pay Olaniyan and Cates for their part in the fraudulent scheme.

Not surprisingly, many of the buyers defaulted, resulting in foreclosure of the home mortgages. As a consequence, the owners of the mortgages lost millions of dollars.

## II. PROCEDURAL BACKGROUND

Snow was indicted with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Snow's guilty plea was the product of a plea agreement.[1] Under the agreement, he waived his right to appeal from his conviction and sentence except to the extent the district court determined enhancements were warranted because (1) the amount of loss associated with the offense exceeded $1,000,000 and (2) the offense involved sophisticated means under USSG §2B1.1(b)(9)(C).

The presentence report (PSR) determined the base offense level to be 7 because the statutory maximum term of imprisonment for the offense was 20 years. *See* 18 U.S.C. §§ 1343, 1349; USSG §2B1.1(a)(1) (calling for a base offense level of 7 if the offense "has a statutory maximum term of imprisonment of 20 years or more").[2] It

---

[1] Although the government filed a superseding indictment adding two counts of wire fraud against Snow, Snow pled guilty to the original conspiracy indictment. The original indictment also contained a forfeiture count, which is not at issue in this appeal.

[2] Snow was sentenced under the 2009 edition of the United States Sentencing Commission Guidelines Manual, which we reference unless otherwise indicated.

calculated the total loss attributable to Snow as $1,096,298.01. This amount represented the amount of loss suffered by the final owners of the loans used to (1) purchase the homes built by Snow but excluding those loans which were refinanced by the buyer,[3] (2) purchase a home built by Hearth Homes, a company owned by John Taylor, Snow's neighbor, and (3) purchase a home built by Gerald in which Snow paid the closing costs. The loss for each transaction was calculated by subtracting the foreclosure sale price from the original loan amount on each property, even though many of the loans had been sold by the original lenders in the secondary market. Because the loss exceeded $1,000,000, the base offense level was increased 16 levels. *See* USSG §2B1.1(b)(1)(I) (calling for a 16-level enhancement if the loss is more than $1,000,000 but not more than $2,500,000). The PSR added another 2 levels because the offense involved the use of sophisticated means. *See* USSG §2B1.1(b)(9)(C). After applying a 3-level downward adjustment for acceptance of responsibility, *see* USSG §3E1.1, the total offense level was 22. Because Snow had no criminal history, his Criminal History Category was I. With that criminal history and a total offense level of 22, the advisory guideline range was 41 to 51 months imprisonment.

Snow objected to the PSR's loss calculation, claiming he should not be held responsible for the loss resulting from the foreclosure sale of the home built by Taylor's

---

[3] A total of twenty-one transactions occurred involving the purchase of a home built by Snow. Four of those transactions involved losses but were not included in the loss calculation because the buyer had refinanced. Eight transactions did not result in a loss or no loss was determined. The home involved in one transaction was destroyed by fire and the mortgage was discharged. Thus, only nine transactions involving the purchase of a home built by Snow were used in the loss calculation.

company (loss of $102,244.58) because his involvement in that transaction (the Taylor transaction) was limited to answering Taylor's questions regarding whether to start a home-building business. He alleged Gerald was the perpetrator of the fraud in that transaction. Without the Taylor transaction, the total loss would be less than $1 million, resulting in a 14-level enhancement (as opposed to a 16-level enhancement) under the guidelines. *See* USSG §2B1.1(b)(1)(H) (14-level enhancement applies if the loss is between $400,000 and $1 million). Snow also objected to the 2-level sophisticated means enhancement. He argued his offense conduct was neither "complex nor intricate" and "was not any more sophisticated than the ordinary fraudulent mortgage transactions case." (R. Vol. 3 at 66.)

After a hearing, the district court overruled Snow's objections. It determined the loss flowing from the Taylor transaction should be attributed to Snow:

> Gerald Snow, Sr. assisted John Taylor and his wife Dana in forming an Oklahoma corporation named "Hearth Homes, Inc." Snow, Sr. sold Taylor a lot on which to build a home and later assisted Taylor in the purchasing of materials and acquiring of contractors to build the home.
>
> Jerry Snow went with Taylor to First National Bank of Broken Arrow, Oklahoma, to acquire a loan and initially provided subcontractors and helped in the purchasing of materials for the building of the home. After the home was furnished, Gerald Snow, Sr., without the knowledge and permission of Hearth Homes, Inc., approved, signed, and thereby caused others to approve and sign a false and fraudulent HUD-1 settlement statement in the sale of the home to Vicki Shaw. The statement purported an inflated sales price, the buyer to be paying closing costs, which were actually paid by Snow, Sr., and Snow, Sr. to be an agent of Hearth Homes, Inc.
>
> Based upon the facts in this case, it appears that Jerry Snow's involvement with John Taylor's business may not have been to the extent of his co-defendant, Gerald Snow, Sr. However, Jerry Snow was, at the very least, initially involved in assisting Taylor with the building of the home.

Due to the commingling of funds from Jerry Snow and Gerald Snow, Sr.'s companies during this extensive mortgage fraud scheme, it was reasonably foreseeable to Jerry Snow that Gerald Snow, Sr. would employ the same fraudulent means in selling the Taylors' home that the defendants employed continuously throughout this mortgage fraud scheme.

(R. Vol. 2 at 16-18.)

With regard to the sophisticated means enhancement, the court determined it was appropriate:

Based on the evidence in this case, buyers were advised that they needed little or no down payment money and the sellers would pay closing costs and second mortgages.

Further, the defendant and his co-conspirators falsified loan documents by creating false employment verifications, fraudulently inflating purchasers' bank accounts and inflating purchase prices for the homes which allowed loan proceeds in an amount greater than the true purchase price. Purchasers were required to execute second mortgages provided by the defendants at the time of closing; however, the purchasers were advised that they would not be required to make payments on the second mortgages.

This scheme required extensive knowledge of the mortgage industry, to include construction finance, which helped the defendant and his co-conspirators get mortgage lenders to approve buyers for home purchases by false means, ultimately resulting in foreclosures due to the buyer's inability to make mortgage payments.

(R. Vol. 2 at 18-19.)

The court adopted the PSR as the factual basis for the sentence. It also granted an additional two-level downward departure based on the government's motion under USSG §5K1.1, which informed the court of Snow's substantial assistance to it. Therefore, the total offense level was 20, resulting in an advisory guideline range of 33 to 41 months imprisonment. The court sentenced Snow to 40 months.

## III. DISCUSSION

Snow argues the court erroneously attributed to him the loss resulting from the Taylor transaction and, for the first time, claims the court should not have held him accountable for the loss caused to downstream purchasers of the original loans. He also contends applying the two-level sophisticated means enhancement was improper.

A. Loss Calculation--Taylor Transaction

By including the $102,244.58 loss suffered by the financial institution in the Taylor transaction, the total losses attributable to Snow amounted to $1,096,298.01, enough to raise the guideline enhancement from 14 to 16. Snow admits the district court accurately recited the facts of that transaction—he accompanied Taylor to the bank to acquire a construction loan, initially helped Taylor in the purchasing of materials for the construction of the home and provided subcontractors to build the home—but claims it erred in concluding those facts were sufficient for him to reasonably foresee that Gerald would subsequently employ fraudulent means in selling the home. Indeed, he says at the time he assisted Taylor in obtaining a construction loan and subcontractors to build the home (conduct which the government did not allege was fraudulent), there was nothing to indicate that anyone other than Taylor would sell the home. Were we to correct this alleged error, Snow claims the total loss attributed to him would be less than $1 million, reducing his total offense level to 18 and the advisory guideline range to 27 to 33 months imprisonment.

We review sentences for reasonableness under an abuse of discretion standard. *United States v. Lopez-Macias*, 661 F.3d 485, 488-89 (10th Cir. 2011). Reasonableness

review consists of both a procedural and a substantive component. *Id*. at 489. "The procedural component focuses on the manner in which the sentence was calculated, and the substantive component concerns the length of the sentence actually imposed." *United States v. Masek*, 588 F.3d 1283, 1290 (10th Cir. 2009) (quotations omitted). Snow does not challenge the substantive reasonableness of his sentence; he challenges only the district court's calculation of the applicable guideline range, i.e., the procedural reasonableness of his sentence. *See Gall v. United States*, 552 U.S. 38, 51 (2007) (stating the district court's improper calculation of the guideline range is an example of procedural error).

> When a defendant challenges the procedural reasonableness of h[is] sentence by attacking the district court's loss calculation, our task is to determine whether the district court's factual finding of loss caused by the defendant's fraud is clearly erroneous. That is, we may disturb the district court's loss determination—and consequent Guidelines enhancement—only if the court's finding is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made. To be clearly erroneous, a finding must be more than possibly or even probably wrong; the error must be pellucid to any objective observer. In conducting our inquiry, we are mindful that the district court need only make a reasonable estimate of the loss, not make a perfect accounting. Accordingly, we owe the sentencing [court] appropriate deference, in recognition of [its] unique position to assess the evidence and estimate the loss based upon that evidence.

*United States v. Mullins*, 613 F.3d 1273, 1292 (10th Cir.), *cert. denied*, 131 S. Ct. 582 (2010) (citations and quotations omitted).

Under USSG §2B.1(b)(1), a defendant's base offense level is increased according to the amount of loss resulting from the fraud. The "loss is the greater of actual loss or

intended loss."[4]  USSG §2B1.1, comment. (n.3(A)).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."  USSG §2B1.1, comment. (n.3(A)(i)).  "Pecuniary harm" is "harm that is monetary or otherwise is readily measurable in money" and "reasonably foreseeable pecuniary harm" is "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  USSG §2B1.1, comment. (n.3(A)(iii), (iv)).

"In calculating the amount of loss, the guidelines look not only to the charged conduct but to all relevant conduct by the defendant."  *United States v. Flonnory*, 630 F.3d 1280, 1286 (10th Cir. 2011) (citing USSG §§1B1.2(b), 1B1.3).  Relevant conduct "in the case of a jointly undertaken criminal activity  . . . [includes] all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  USSG §1B1.3(a)(1)(B).  The question posed in this case is whether Gerald's fraudulent conduct in the Taylor transaction was reasonably foreseeable to Snow.

At sentencing, the government enriched the factual record with the following evidence concerning the Taylor transaction.  Taylor was Snow's neighbor.  Taylor became interested in building homes and approached Snow on how to do so.  Snow told

---

[4] Snow is only challenging whether the district court's loss calculation represents the actual loss resulting from his conduct.  Thus, we need not address the issue of intended loss.  Moreover, the guidelines provide that if there is loss but it cannot be reasonably determined, the court shall use the gain that resulted from the fraud as an alternative measure of loss.  USSG §2B1.1, comment. (n.3(B)).  Gain is not at issue in this appeal.

Taylor "it's real easy" and he would "help [him] out and show [him] the ropes." (R. Vol. 2 at 89 (quotations omitted).) Snow told Taylor he would need to start a business. While Snow talked to Taylor about starting a business, it was Gerald who showed Taylor how to incorporate. Snow, Taylor and Gerald met at Snow's house. Taylor eventually started Hearth Homes. Snow showed Taylor various house plans and drove him around to look at houses which would be reasonably inexpensive to build. They then went to the bank to obtain a construction loan. In seeking approval for the construction loan, Taylor informed the bank Snow would supervise the home's construction and provide the subcontractors. He also told the bank Judy Snow, Snow's mother and Gerald's ex-wife, would provide marketing assistance once the house was built. Snow provided the subcontractors for the construction of the home. He also initially helped Taylor obtain building supplies but Gerald eventually took over this role. Gerald sold Taylor the lot for the construction of the home. Once construction was completed, a real estate company owned by Snow's mother listed the home for sale. Gerald was also involved in the sale of the home; Snow was not. The home was sold to Vicki Shaw, Olaniyan's girlfriend's mother. Both Gerald and Olaniyan promised Shaw money back after closing and informed her she would not have to pay any closing costs. The loan application was prepared by Olaniyan and overstated Shaw's monthly income. Gerald provided Shaw $55,767 for the closing costs. The closing documents did not indicate this money came from Gerald. Although the title company issued a check for $143,000 to Hearth Homes as the proceeds from the loan, the money went to Gerald. After closing, Shaw received $20,000 in cash back from Gerald. Gerald also paid $21,000 to Olaniyan. The lender

was never made aware of these payments.

This evidence shows the only direct involvement Snow had in the Taylor transaction was: (1) his original discussions with Taylor regarding the starting of a home construction business, (2) introducing Taylor to Gerald and allowing them to meet at his home; (3) showing Taylor house plans, (4) accompanying Taylor to the bank to obtain a construction loan whereby the bank was advised Snow would be providing supervision and subcontractors for the home's construction, (5) providing Taylor with subcontractors for the home's construction, and (6) initially helping Taylor obtain building supplies and materials. As the district court found, the fraud committed in the Taylor transaction was mainly conducted by Gerald and Olaniyan. Nevertheless, by the time Taylor obtained the construction loan on December 22, 2004, Snow and Gerald's fraudulent scheme had already claimed numerous victims. And, one of those transactions involved a home purchased from someone other than Snow or Gerald. Admittedly, that one transaction only directly involved Gerald and Cates. Nevertheless, there were numerous transactions involved in the fraudulent scheme which only involved Snow, not Gerald. But the scheme was always the same—the construction of a home, inducing buyers to purchase the home by paying their closing costs and down payments, falsifying loan documents with the help of Cates and/or Olaniyan, and obtaining loan proceeds in excess of the purchase price. Thus, the mere fact a particular transaction involved either Snow or Gerald is irrelevant to the foreseeability of the ongoing fraud. Indeed, other transactions involved both Snow and Gerald. And one of those transactions closed on December 10, 2004, just twelve days before Taylor obtained his construction loan with Snow's

- 11 -

assistance. The modus operandi was set and Snow offered no reason to assume it would not be followed.

Perhaps the most damaging evidence against Snow is the fact he introduced Taylor to Gerald. Had Snow wanted to limit his involvement with Taylor to simply helping a neighbor start a home construction business, he would never have introduced Taylor to Gerald, his cohort in the fraudulent scheme. The issue is reasonable foreseeability, not actual knowledge. Given Gerald's participation with Snow in the fraudulent scheme, it should have come as no surprise to Snow, i.e., it should have been reasonably foreseeable to Snow, that when he involved Gerald, fraud ensued. Given his and Gerald's history together, he had no reason to assume the tiger (Gerald) would change his stripes.

Neither of the cases relied upon by Snow are helpful. In *United States v. Melton*, Melton pled guilty to conspiracy to violate federal counterfeiting laws. 131 F.3d 1400 (10th Cir. 1997). The district court held Melton responsible for $30 million in loss. That amount represented the amount of counterfeit money printed in a reverse sting operation set up by the government <u>after</u> Melton was arrested. In vacating the sentence, we noted that in determining the scope of a defendant's conduct for purposes of sentencing, "[a] court must keep in mind that 'the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy.'" *Id.* at 1404 (quoting USSG §1B1.3, comment. (n.2)). We concluded the district court had improperly held Melton accountable for activity that took place after his arrest given there was no evidence indicating the scope of the reverse sting operation was within the scope of the criminal activity he had agreed to undertake prior to his arrest. *Id.* at 1404-

- 12 -

05.  Limiting Melton's role to his pre-arrest conduct, we determined that while Melton

may have reasonably foreseen that the counterfeit operation would result in the

production of a large amount of counterfeit money, absent any factual support, it was

entirely arbitrary that that amount would be $30 million.  *Id.* at 1406.

In *United States v. Rothwell*, Rothwell obtained a disaster relief loan from the

Small Business Administration (SBA) to reconstruct a building destroyed by a storm.

387 F.3d 579 (6th Cir. 2004).  During the construction process, he fraudulently obtained

several progress payments.  After the building was constructed, Rothwell defaulted on the

loan, resulting in a $545,000 loss to the SBA.  Rothwell pled guilty to making a false

statement.  In calculating the actual loss from Rothwell's offense, the district court

determined the fraudulent progress payments caused approximately 20-25% of the SBA's

loss ($545,000) or $103,000.  The Sixth Circuit reversed, concluding the court's loss

calculation was faulty:

> Rothwell's act of fraudulently obtaining one or more progress payments in an
> otherwise legitimate loan transaction cannot reasonably be considered to have
> caused the SBA's loss under either a "but for" or a legal cause analysis. The SBA
> incurred the loss on foreclosure because Rothwell was unable to make the loan
> repayments.  In fact, Rothwell made payments on the loan for 23 months and then
> defaulted.  Neither the district court nor the Government provided any explanation
> of why or how Rothwell's fraudulent conduct during the construction of the
> building made it more likely that Rothwell would later default on the loan.  There
> are myriad explanations for the default--an unsound business risk, a poor
> economy, excess warehouse or office space in the local market, or developments
> in unrelated transactions affecting Rothwell's ability to repay the SBA loan--all of
> which are more likely causes than the fraud-induced progress payment.

*Id.* at 584.

Both *Melton* and *Rothwell* are distinguishable.  In this case, unlike in *Melton*, there

was no intervening arrest ending Snow's involvement in the conspiracy. Moreover, the district court did not arbitrarily assign a loss amount to Snow's conduct without determining foreseeability; instead, it made particularized findings that the loss associated with the Taylor transaction was reasonably foreseeable to Snow. The issue in *Rothwell* was causation—the court determined loss by taking a percentage of the amount the SBA lost due to Rothwell's default. However, there was no evidence Rothwell's offense conduct—his submission of fraudulent progress reports—caused the default. Here, to the contrary, once the court determined Snow reasonably foresaw that Gerald would not depart from his customary fraudulent means in obtaining a loan in the Taylor transaction, it was beyond question that that fraud caused loss to the lender.

The district court did not clearly err in attributing the loss resulting from the Taylor transaction to Snow.

B. Loss Calculation—Loss to Downstream Purchasers

Of the eleven transactions used to calculate the loss attributable to Snow, all but one of the loans was sold by the original lender to a downstream purchaser in the secondary market. The court calculated the loss by subtracting the original loan amount from the amount realized by the downstream purchaser as a result of foreclosure. Snow claims it was error for the court to do so as it was not reasonably foreseeable to him that the original lenders would sell the loans and the court made no such finding. In other words, Snow contends he did not reasonably foresee any harm beyond that to the original lenders. Considering only the loss to the original lenders, Snow argues the court should have calculated the loss as the difference between the outstanding balance on the loan and

- 14 -

the amount the original lender received when it sold the loan in the secondary market. Because this amount does not appear in the record, Snow claims we should remand to the court to make the required findings. He relies on *United States v. James*, 592 F.3d 1109 (10th Cir. 2010).

Snow's argument is a challenge to the procedural reasonableness of his sentence. *See Gall*, 552 U.S. at 51. We normally review the method the district court used to calculate loss de novo and the factual findings underlying that calculation for clear error. *United States v. Washington*, 634 F.3d 1180, 1184 (10th Cir.), *cert. denied*, 132 S. Ct. 300 (2011). However, since Snow failed to raise this argument with the district court, our review is for plain error. *See United States v. Romero*, 491 F.3d 1173, 1177-78 (10th Cir. 2007). Under the plain-error test, Snow "must demonstrate the district court (1) committed error, (2) the error was plain, and (3) the plain error affected his substantial rights. If these factors are met, we may exercise discretion to correct the error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cordery*, 656 F.3d 1103, 1105 (10th Cir. 2011) (citation omitted).[5] We see no error, let alone plain error.

In cases like this one, "where the defendant has pledged collateral to secure a fraudulent loan, actual loss should be measured by the net value, not the gross value, of

---

[5] In his plea agreement, Snow waived his right to appeal his conviction and sentence except to the extent the district court determined (1) the amount of loss exceeded $1,000,000 and (2) the offense involved sophisticated means under USSG §2B1.1(b)(9)(C). His argument concerning the downstream purchasers falls within the scope of the first exception because excluding their losses would reduce the total loss to less than $1,000,000.

what was taken." *James*, 592 F.3d at 1114 (quotations omitted). Where a lender has foreclosed on and sold the collateral, the net loss is calculated by subtracting the sales price from the amount of the outstanding balance on the loan. *Id.* The court used a similar method in this case.[6] Snow argues, however, this method only applies when the original lender retains the original loan and receives the sale proceeds. He claims when, as here, the original loan has been sold to a downstream purchaser, the loss to the original lender is the difference between the outstanding balance on the original loan and the amount the original lender received when it sold the loan.

As an initial matter, we easily dispose of Snow's argument that the district court did not find the downstream purchasers were reasonably foreseeable victims of his fraud. While the court did not make an explicit finding in this regard, it implicitly did so by adopting the PSR's factual findings which determined: "[I]t is widely known that mortgages are routinely repackaged and resold; therefore, secondary lenders suffer significant losses, when the purchasers fail to make mortgage payments on purchased properties. Due to the sale of loans . . ., the final mortgage lenders on the properties are the victims of the conduct of Jerry Snow." (R. Vol. 3 at 55.)

In any event, absent such a finding, we see no error. Snow's argument is based on

---

[6] In calculating loss, the court subtracted the foreclosure sale price from the original loan amount rather than from the outstanding balance on the loan. It is unclear from the record whether any of the buyers made payments on the loans or, if they did, what portion of the payments was applied to the loan's principal. Therefore, it is unclear whether the outstanding balances on the loans differed from the original loan amounts and, if so, to what extent. Nevertheless, Snow has not claimed error in this regard; his argument is limited to whether the district court properly attributed the loss to the downstream purchasers to him.

the faulty premise that the only loss that occurred as a result of his fraud was to the original lenders. However, as stated above, USSG §2B1.1 describes "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense" and defines "reasonably foreseeable pecuniary harm" as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." USSG §2B1.1, comment. (n.3(A)(i), (iv)). Therefore, the guideline looks to the harm reasonably foreseeable as a result of an <u>offense</u>; it is not necessary that the defendant has reasonably been able to identify the <u>ultimate victim or victims</u> of his offense, only that the ultimate harm to others (whomever they might be) was foreseeable. Obviously Snow knew someone was going to be harmed by his conduct. Consequently, the district court's loss calculation properly focused on the <u>total loss</u> resulting from Snow's fraud rather than on <u>who</u> suffered the loss. *See James*, 592 F.3d at 1117 (Lucero, J., concurring) ("[The] commentary [to USSG §2B1.1] does not direct us to focus on harm to any particular victim; rather, it mandates that we focus on the *total* loss resulting from the commission of fraud to the extent the total loss is reasonably foreseeable.").

Snow's reliance on *James* is unavailing. There, like in this case, many of the loans procured by James' fraud were resold to downstream purchasers. Nevertheless, the district court specifically found "the losses of those entities [did] not constitute reasonably foreseeable pecuniary harm, because the decision to resell the original loans was made entirely by the original lender without the knowledge or input from the defendant." 592 F.3d at 1112 (quotations omitted). The government did not challenge this finding on appeal. *Id.* at 1116. Given this factual finding, we concluded the loss

- 17 -

suffered by the downstream purchasers could not be considered in the total loss

calculation. *Id.* at 1115-16. Therefore, we were limited to considering only the loss to

the original lenders. And, because most of the original lenders had sold the loans, the

loss to the original lenders was the difference between the outstanding balance on the

original loans and what they received when they sold the loans. *Id.* at 1111, 1115.

Here, in contrast, we have no finding of unforeseeable loss to the downstream

purchasers. Indeed, the court implicitly found the opposite to be true. Therefore, the loss

calculation was not limited to the loss suffered by the original lenders.[7] *See Washington*,

634 F.3d at 1184-85 (including loss to downstream purchasers in loss calculation where

district court had concluded it was reasonably foreseeable to Washington that the loans

would be sold; distinguishing *James* based on district court's explicit finding that the

---

[7] Judge Lucero concurred in *James*. In doing so, he made a convincing argument
that the total loss resulting from a mortgage fraud scheme, as opposed to the total loss to
a particular victim, is the same regardless of whether the original loan is sold or how
many times it is sold, i.e., the loss is always the original mortgage amount less the
foreclosure price. 592 F.3d at 1117. That is because the original lender receives a profit
when it sells a loan. *Id.* That profit must be subtracted from the successor lender's loss
to arrive at a net loss <u>for the transaction</u>. *Id.* Thus, the total loss of the <u>transaction</u> "is the
loss to the successor lender (the original mortgage plus the original lender's profit minus
the foreclosure price) less the gain to the original lender (the original lender's profit)."
*Id.* "Because the original lender's profit is first added in and then subtracted out of the
loss total, it cancels itself out." *Id.* As a result, the total loss in a mortgage fraud scheme,
even in cases where the original loan is sold, is the original loan amount less the
foreclosure price. *Id.* And this amount is always reasonably foreseeable to the person
committing the fraud—"[h]e may not foresee who will suffer the loss resulting from his
fraud, but he will be able to predict that a loss will be suffered and the approximate . . .
amount of that loss." *Id.* at 1117-18. Nevertheless, Judge Lucero concurred with the
result reached by the majority because the court's hands were tied given the district
court's specific finding (not challenged on appeal) that the losses suffered by the
successive lenders were not reasonably foreseeable. *Id.* at 1118.

losses to downstream purchasers were not reasonably foreseeable to James).[8]

C. Sophisticated Means Enhancement

Snow says the court erred in applying the two-level sophisticated means enhancement because his offense was not sufficiently sophisticated to warrant such enhancement. "When reviewing a district court's application of the Sentencing Guidelines, we review legal questions *de novo* and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Jones*, 530 F.3d 1292, 1305 (10th Cir. 2008) (quotations omitted). Where, as here, the defendant does not contest the district court's findings of fact or its interpretation of the guidelines but only its application of the guidelines to the facts, we review the district court's decision "deferentially rather than *de novo*." *Id.*

USSG §2B1.1(b)(9) provides for a two-level enhancement to the base offense

---

[8] At oral argument, Snow expounded on his argument, claiming the downstream purchasers who bought the original loans failed to examine the loans and only purchased them in order to resell them to yet another entity. He claims this conduct broke the chain of causation, i.e., these entities caused their own harm. Snow did not raise this argument in his opening brief and therefore we do not consider it. *See City of Stilwell, Okla. v. Ozarks Rural Elec. Coop. Corp.*, 166 F.3d 1064, 1074 n.13 (10th Cir. 1999) ("[A]n issue not adequately briefed will not be considered even though a party attempts to assert the claim during oral argument."); *see also United States v. Quaintance*, 608 F.3d 717, 720 n.2 (10th Cir.), *cert. denied*, 131 S.Ct. 544 (2010), *cert. denied*, 131 S. Ct. 547 (2010) (declining to address arguments not raised in the parties' briefs but addressed for the first time at oral argument and through supplemental filings). In any event, it is entire speculation on Snow's part that the downstream purchasers did not examine the loans prior to purchasing them. Moreover, as explained above, Snow could reasonably foresee someone would be harmed by his fraud. Therefore, even assuming a lack of diligence and an improper motive on the part of those entities who purchased the original loans, all these entities did was pass on the loss to another victim—the loss was still caused by Snow's fraud, just the victim changed.

level if the offense involved sophisticated means.  The commentary to the guideline

describes sophisticated means as "especially complex or especially intricate offense

conduct pertaining to the *execution or concealment* of an offense."  USSG §2B1.1,

comment. (n.8(B)) (emphasis added).  "The Guidelines do not require every step of the

defendant's scheme to be particularly sophisticated; rather, as made clear by the

Guidelines' commentary, the enhancement applies when the execution or concealment of

a scheme, viewed as a whole, is especially complex or especially intricate."  *United

States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010) (quotations omitted).

This issue is controlled by our decision in *United States v. Snow*, 663 F.3d 1156,

1164 (10th Cir. 2011), which decided Gerald's appeal.  Gerald, like Snow, pled guilty to

various charges arising out of the same fraudulent mortgage scheme.  The district court

imposed the sophisticated means enhancement to his sentence and we affirmed:

> Mr. Snow did not did not undertake to execute or conceal merely a single
> fraudulent transaction using false documentation but orchestrated a vast and
> complex fraud scheme in which he participated in over forty fraudulent mortgage-
> related transactions to defraud [numerous] different financial institutions.
> Evidence of the complexity of this scheme is demonstrated, not only by the
> lengths Mr. Snow took to execute it, but the actions he took to successfully
> conceal the scheme from the financial institutions and title companies involved,
> which included sufficient sophistication in the execution and concealment of the
> scheme to fool trained and experienced bank and closing personnel into approving
> over forty fraudulently-obtained home loans.  The record is absolutely replete with
> instances of Mr. Snow successfully executing and concealing the scheme through
> especially complex conduct, included his providing, and directing others to
> provide, fraudulent documentation and information sufficient to fool those
> reviewing it; disbursing, and instructing others to disburse, funds below the
> currency transaction reporting thresh-old; procuring, or instructing others to
> procure, cashiers' checks to disguise the true source of the buyers' down
> payments; providing down payments, closing funds, and debt reduction for buyers
> to qualify for loans; circulating, or instructing his son to circulate, funds through
> his and his son's business and bank accounts to avoid detection; and teaching a

> loan originator how to create fictitious second mortgages to help qualify buyers and fool the title and financial institutions involved.

*Id.* That reasoning is equally apropos here and supports the district court's imposition of the enhancement.

Snow claims the scheme was not sophisticated because there were no fictitious entities, corporate shells or offshore financial accounts. The commentary to the sophisticated means guideline provides the following example of the use of sophisticated means: "[I]n a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means." USSG §2B1.1, comment. (n.8(B)). It then provides: "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." *Id.* Clearly, the latter is an example of conduct involving the use of sophisticated means; it by no means says the use of fictitious entities, corporate shells or offshore financial accounts is necessary for the sophisticated means enhancement to apply.

Snow relies on *Weiss* as an example of a sophisticated mortgage fraud scheme but that case actually supports the application of the enhancement in this case. Weiss, a real estate broker, (1) helped buyers obtain subsidized FHA loans even though they were ineligible for the loans, (2) gave lenders false information about the buyers, and (3) paid the buyers' down payments in violation of FHA rules. We concluded the district court did not err in concluding this scheme employed sophisticated means. 630 F.3d at 1279.

The facts in *Weiss* are substantially similar to those here. Nevertheless, Snow says Weiss was a sophisticated real estate broker who knew how to circumvent FHA loan requirements. He, on the other hand, was a career fireman who eventually started to build homes. The distinction is irrelevant. Both *Weiss* and this case involve the same sophisticated conduct—the execution and concealment of a mortgage fraud scheme.

**AFFIRMED.**

Entered by the Court:


Terrence L. O'Brien
United States Circuit Judge