# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-3166

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOSEPH D. CASTELLANO,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:01CR30073-001 DRH—**David R. Herndon**, *Judge.*

———————

ARGUED OCTOBER 31, 2003—DECIDED NOVEMBER 17, 2003

———————

Before POSNER, EASTERBROOK, and EVANS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Joseph Castellano and his son Monte managed The Joseph Daniel Company, which built single-family homes. Customers financed this work with bridge loans from Old Exchange National Bank of Okawville, Illinois. To attract business, the firm offered low prices—too low, it turns out, to cover the cost of construction. Losing money on every sale while trying to make it up on volume is a formula for disaster—and an invitation to fraud. The Bank agreed to disburse the construction loans in thirds: the first when the buyer signed the contract, the second when the buyer certified that the house had been made weather-tight, and the third when the buyer certified

that construction had been finished to his satisfaction. The Castellanos persuaded their customers to allow them to certify these milestones on their behalf. Joseph and Monte began to make these certifications prematurely, using new customers' funds to finish older projects. Insolvency was inevitable. By the time even accelerated draws could no longer pay the bills, the business was about $2 million under water—leaving buyers with loan obligations but no houses, the Bank with little security for its advances, and unpaid subcontractors holding liens against unfinished houses. The Bank paid the subcontractors to complete houses already under way and told the buyers of houses that had not been started that they need not repay the loans. And federal prosecutors charged Joseph, Monte, and their company with wire fraud, see 18 U.S.C. §1343. All three defendants pleaded guilty.

Joseph, alone among the three, has appealed, and his appeal is limited to calculation of his 97-month sentence. His initial argument is that, because the Bank made the borrowers whole, the scheme did not inflict any loss for purposes of the Sentencing Guidelines. As he sees things, the buyers were the intended victims, and they emerged unscathed. There are two problems with this contention. First, the lender was as much a victim as the borrowers; the Bank contracted for security (the houses in progress) that it did not get. Second, a collateral source of recovery does not eliminate but just shifts the loss. If the buyers had purchased insurance to protect themselves from fraud, their receipt of indemnity would not have absolved the wrongdoers.

Next comes an argument that the district court should not have added two levels under U.S.S.G. §3B1.3 for abusing a position of trust. Castellano contends that he and the firm engaged in arms'-length commercial dealings with the Bank and their customers. That is indeed how the dealings began, but Joseph and Monte persuaded their customers (and the

Bank) to let them make accurate certifications when drawing loan proceeds. Having obtained (by contract) the right to act on behalf of the customers when certifying construction milestones, the Castellanos had an obligation to use that power on behalf of these customers. Application Note 1 to §3B1.3 says that a position of trust is "a position of public or private trust characterized by professional or managerial discretion". That's a good description of the authority that the customers conferred on the Castellanos; and instead of exercising professional discretion to determine when the milestones had been met, they abused the trust reposed in them. See *United States v. Frykholm*, 267 F.3d 604, 612-13 (7th Cir. 2001).

A third contention is that the restitution is excessive. To the extent this rests on a belief that only the borrowers were injured, and that the Bank's losses are consequential damages that may not be included in restitution awards, it is wrong for the same reason the challenge to the loss calculation is incorrect. Joseph also contends that about $26,000 of the restitution award comes from double counting (requiring restitution to *both* the customer and the Bank for the same loss), consequential injury—which is not appropriate in criminal restitution, see *United States v. Behrman*, 235 F.3d 1049 (7th Cir. 2000); *United States v. Marlatt*, 24 F.3d 1005 (7th Cir. 1994)—or items unrelated to the crime. Joseph's brief goes into detail. It observes, for example, that the district court ordered him to pay $1,850 in restitution to Kim and Sheila Harper, whose home was completed as promised but who decided after moving in that they wanted additional features, such as plumbing for a bar in the dining room. How the cost of features beyond those called for by the construction contract could be part of restitution is hard to understand. The prosecutor's response, contained in a single paragraph, offers no detail and essentially invites us to scour the record unaided. That is not the appropriate relation between advocates and the

judiciary. Joseph's argument in this respect stands unanswered, and the amounts contested at pages 42-47 of his brief concerning individual customers must be removed from the award.

Last, and most significant, is Joseph's contention that the district court erred in adding four levels to his offense score under U.S.S.G. §2F1.1(b)(7)(B) on the ground that the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense". (By the parties' agreement, sentencing was conducted under the 1998 version of the Guidelines Manual. Since then, the provision has been moved to U.S.S.G. §2B1.1(b)(12)(A) and the addition has been reduced to two levels, but Joseph has not sought to take advantage of the change, for doing so would require application of the whole 2001 manual, including other alterations unfavorable to him.) These four levels came on top of the 12 levels added, per the 1998 version of §2F1.1(b) (1)(M), for causing a loss between $1.5 million and $2.5 million, and account for the fact that substantial injuries suffered by financial institutions may have reverberations, such as losses to the federal deposit-insurance funds. Application Note 18 to the 1998 version of §2F1.1 reads:

> "The defendant derived more than $1,000,000 in gross receipts from the offense," as used in subsection (b)(7)(B), generally means that the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000. "Gross receipts from the offense" includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense. See 18 U.S.C. § 982(a)(4).

Everything that Joseph Daniel Company obtained from the Bank as a result of the premature certifications counts as "gross receipts"; but did Joseph obtain $1 million of receipts

"individually"? The money entered the corporation's coffers, not Joseph's pocket, and most was distributed to pay the expenses of construction. Less than $200,000 reached Joseph as salary or reimbursement of his expenses. None of the money redounded to his benefit indirectly through the corporation's securities—not only because the stock was worthless, but also because Monte owned all of it. Cf. *United States v. Bennett*, 161 F.3d 181 (3d Cir. 1998). What the district judge said—and what the United States echoes in its appellate brief—is that all of the corporation's receipts must be attributed to Joseph because he founded the business and was its principal manager. In the judge's language: "Monte answered to him. He made the decisions. He was the business. . . . The business was him." In other words, the judge thought, corporate formalities should be disregarded for closely held firms, or at least for those whose operations are dominated by one person.

This approach assumes that federal common law determines when the revenues of a corporation are imputed to a manager or investor. Nothing in the Sentencing Guidelines specifies what it means to receive proceeds "individually," and the prosecutor does not rely on any state or federal statute, so the appeal must be to common law. Yet why should federal common law determine the relation among a corporation and its managers, employees, or investors? It is unlikely that the United States would contend that all of the corporation's receipts count as taxable income to Joseph, see 26 U.S.C. §61; even closely held corporations, unless organized under Subchapter S, are treated as distinct entities that must pay their own taxes, and their revenues are treated as personal income only to the extent distributed via salary or dividends. Unless some federal statute or regulation addresses the subject, the relation among corporations, managers, and investors is governed by state corporate law even when the claim rests on federal

law. See, e.g., *Atherton v. FDIC*, 519 U.S. 213 (1997). And when federal law "applies" in the sense that some term in a federal statute or rule requires interpretation—as the term "individually" must be construed here— the norm is to borrow from state corporate or agency law unless override is essential to achieve federal objectives. See, e.g., *Clackamas Gastroenterology Associates, P.C. v. Wells*, 123 S. Ct. 1673 (2003); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Thus a closely held corporation may be an "enterprise" for purposes of RICO, and a manager who pulls its strings through a pattern of racketeering may be convicted under that statute. See *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S 158 (2001). A corporation with sufficient substance to serve as a RICO "enterprise" also has sufficient substance to hold receipts for purposes of the Guidelines. This also means that a top manager's ability to control the corporation is not enough to treat the corporation and the manager as a single entity; if that were so, *Cedric Kushner Enterprises* would have come out the other way (for no one doubts that Don King exercises absolute control over his boxing promotions).

States have developed substantial bodies of law addressing the question whether corporate receipts (or corporate debts) may be imputed to investors or managers. These principles, which go under the rubric "piercing the corporate veil," are presumptively applicable when a question of attribution arises under federal law—as it may in tax, pension, labor, securities, and bankruptcy proceedings, among other fields. See, e.g., *Central States Pension Fund v. Art Pape Transfer, Inc.*, 79 F.3d 651 (7th Cir. 1996); *In re Deist Forest Products, Inc.*, 850 F.2d 340 (7th Cir. 1988); *Mayer v. Chesapeake Insurance Co.*, 877 F.2d 1154 (2d Cir. 1989). The prosecutor has not argued that state law must be overridden in order to achieve any policy stated in, or reasonably imputable to, the Sentencing Guidelines.

Application Note 18 calls for receipts to be allocated; how the proceeds are carved up among the three defendants (Joseph, Monte, and the corporation) does not appear to be vital to sentencing policy. It is enough that each dollar count once. That the United States indicted the corporation implies a belief that it had a separate legal existence; that the judge accepted its plea of guilty shows that the district court, too, treated it as an entity distinct from Joseph and Monte. If federal law allows it to stand as an entity capable of being indicted and convicted, Joseph Daniel Company may in principle be treated as the entity that derived the gross proceeds of the fraud.

The Joseph Daniel Company was incorporated in Illinois law, so that is the place to turn—not that the choice matters much, as most states follow the same approach. We canvassed Illinois law in *Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991), and concluded that the corporate form may be disregarded only if it has been used to deceive persons dealing with the business. That the entrepreneur exercises autocratic control (something much emphasized by the district judge) does not justify disregarding the corporate form and equating the firm with its manager. (Recall the discussion of Don King above.) The Bank knew that it was dealing with a corporation, so there was no deceit on that front. Perhaps, however, Joseph formed the corporation, and used Monte as nominal owner, in order to deceive or hide assets from someone else. At oral argument the prosecutor contended that Joseph was trying to secrete assets from his creditors in an earlier bankruptcy; and if some debts passed through that bankruptcy undischarged and Joseph used the corporate form to avoid payment, then Illinois law might look through the corporate form to attribute the firm's receipts and debts to Joseph personally. Some of the district judge's statements during sentencing suggest that he thought that the corporate form had been used to defraud creditors; but so much else of the

judge's discussion suggests that he was relying simply on the fact that it was a closely held corporation that it would be imprudent to seize on these statements as a ground of affirmance. The district judge ought to address this question directly. As with other matters of characterization accomplished by applying established law to particular facts, appellate review is deferential; but first we must be sure that the right body of legal principles has been consulted.

The judgment of the district court is vacated, and the case is remanded for two purposes: first, to remove from the restitution obligation the items we have mentioned; second, to decide whether under Illinois veil-piercing principles Joseph is personally accountable for the receipts and obligations of Joseph Daniel Company.

A true Copy:

      Teste:

                              _____
                              *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*