PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　　*Plaintiff-Appellee,*

v.

DARRELL GLENN PENDERGRAPH,
　　　　　　　*Defendant-Appellant.*

No. 01-4633

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
William L. Osteen, District Judge.
(CR-00-270)

Argued: October 1, 2004

Decided: October 28, 2004

Before LUTTIG and MICHAEL, Circuit Judges, and
Jackson L. KISER, Senior United States District Judge
for the Western District of Virginia, sitting by designation.

---

Affirmed in part; vacated and remanded in part by published opinion.
Judge Luttig wrote the opinion, in which Judge Michael and Judge
Kiser joined.

---

## COUNSEL

**ARGUED:** Thomas Kieran Maher, Chapel Hill, North Carolina, for
Appellant. Lawrence Patrick Auld, Assistant United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Greensboro,
North Carolina, for Appellee. **ON BRIEF:** Anna Mills Wagoner,
United States Attorney, Greensboro, North Carolina, for Appellee.

**OPINION**

LUTTIG, Circuit Judge:

Appellant Darrell Pendergraph was convicted by a jury of all charges in a 20-count indictment. The charges included ten counts of mail fraud in violation of 18 U.S.C. § 1341, eight counts of possessing and uttering forged securities in violation of 18 U.S.C. § 513(a), and one count each of transporting a person in interstate commerce in connection with a scheme to defraud and of transporting forged securities in interstate commerce in violation of 18 U.S.C. § 2314. The district court sentenced Pendergraph to 60 months in prison. He now appeals both his conviction and sentence.

**I.**

Pendergraph was the founder, owner, and president of a general contracting firm, the Centech Building Corporation, which built and renovated commercial buildings. J.A. 598. Some of Centech's contracts required it to acquire surety bonds issued by a third-party insurer. Two categories of surety bonds are at issue in this case: performance bonds, under which the issuer agrees to complete construction in the event that the contractor fails to complete the job, and payment (or labor and material) bonds, under which the issuer agrees to pay all debts associated with the contract should the contractor fail to pay. J.A. 50-51. Insurance companies price and issue surety bonds based on an assessment of the risk that the contractor will not perform its obligations under the contract. J.A. 54.

When Centech required a surety bond, it would often ask Bill Massey, who owned an independent insurance agency, to acquire the bond. J.A. 119. In the fall of 1998, Centech and Massey attempted to find bonding for two jobs: the construction of a Food Lion grocery store and a Sleep Inn motel. J.A. 133. Unable to acquire valid bonds by the contract deadline, Massey drafted false performance bonds for both of the projects and a false payment bond for the Sleep Inn project, using documents he had obtained when he was a licensed independent agent writing bonds for Cincinnati Casualty Company. J.A. 138-39. Pendergraph signed the false bonds that day, but nonetheless continued to search for legitimate bonds. J.A. 242. In February 2000,

Cincinnati Casualty Company received claims on the fraudulently issued bonds, and discovered the scheme engaged in by Massey and Pendergraph. J.A. 61-62. Centech was not permitted to finish either of the two fraudulently bonded projects. J.A. 663.

At trial, the primary dispute was over whether Pendergraph *knew* that the bonds were fraudulent, as required under the relevant statutes. The jury convicted Pendergraph on all counts. At sentencing, the district court enhanced Pendergraph's sentence under section 2F1.1 of the Sentencing Guidelines, which requires the district court to calculate the "loss" attendant to Pendergraph's scheme. The PSR calculated the *actual* loss that Pendergraph inflicted on his victims to be $1,431,176.69. J.A. 1067. However, in adjusting Pendergraph's sentence, the district court relied on an estimate of the reasonable amount of possible loss to which Pendergraph had exposed the victims — which the court concluded was $3,000,000. J.A. 1175-76. This amount of loss resulted in a 13-point enhancement. U.S.S.G. § 2F1.1(b)(1)(N) (2000). The court also applied a four point enhancement because Pendergraph received at least $1,000,000 in gross revenue from the fraud and the fraud affected a financial institution. U.S.S.G. § 2F1.1(b)(8)(b) (2000).

## II.

Appellant raises several challenges to his conviction. Initially, he claims that his conviction should be overturned because there was insufficient evidence from which a jury could find beyond a reasonable doubt that the bonds at issue in this case were "securities" for the purposes of his convictions under 18 U.S.C. §§ 513(a) and 2314. While appellant concedes that the statutory definition of "security" includes a "bond," *see* 18 U.S.C. §§ 513(a), 2314, he claims that *Reves* v. *Ernst & Young*, 494 U.S. 56, 65 (1990) forecloses the conclusion that the surety bonds in this case were, in fact, securities. In *Reves*, the Court held that not all "notes" are included as "securities" under 15 U.S.C. § 78c(a)(10) — even though the section defines "security" as including "any note" — because "Congress was concerned with regulating the investment market, not with creating a general federal cause of action for fraud." *Id.* The Court therefore held that the phrase "any note" "must be understood against the backdrop of

what Congress was attempting to accomplish in enacting the Securities Acts." *Id.* at 62-63.

Whether *Reves* should be extended to bonds in the context of the definition of a security under 18 U.S.C. §§ 513(a) and 2314 — the statutory provisions at issue in this case — is an open question. Because Pendergraph did not raise the question at trial, we review only for plain error. Fed. R. Crim. Proc. 52(b). In light of the plain language of 18 U.S.C. §§ 513(a) and 2314, the fact that different statutes are at issue in this case than were at issue in *Reves*, and the fact that not even before this court does appellant advance the necessary arguments to determine whether §§ 513(a) and 2314 are similar in material respects to § 78c(a)(10), we cannot say that there is plain error in Pendergraph's conviction.

Appellant further contends that the district court interrupted him so frequently during his testimony that he was prejudiced before the jury. Because he did not object to the questioning at trial, we consider whether the "judge's comments were so prejudicial as to deny [the defendant] an opportunity for a fair and impartial trial." *United States* v. *Godwin*, 272 F.3d 659, 673 (4th Cir. 2001). The district court interrupted Pendergraph and Massey, the government's key witness, with roughly equal degrees of regularity, and appellant points to no interruptions that constitute the "evidence of partiality or bias" that would be necessary to find improper influence on the jury. *United States* v. *Parodi*, 703 F.2d 768, 776 (4th Cir. 1983). Accordingly, we find this claim to be without merit.

Appellant also challenges his conviction on the grounds that the district court erred in excluding a stipulation by the government that the phrase "grease the skids" in an e-mail that appellant sent was not understood by the recipient as requesting illegal action. The e-mail was sent by Pendergraph on January 8 — one week before the false bonds were signed. J.A. 936. The government claims that it used the e-mail only to show that Pendergraph was aware as of January 8 (and, due to a follow-up e-mail request, as of January 15) that he did not have a valid bond. Appellant points to nothing in the record to support his contention that the government attempted to use the evidence to prove that the defendant was willing to act improperly to obtain bonds.

Decisions as to the admission or exclusion of evidence are within the province of the district court, and any error in such decisions is

subject to review under the harmless error test. *United States* v. *Francisco*, 35 F.3d 116, 118 (4th Cir. 1994). Given that the only evidence or argument in the case regarding the meaning of the phrase "grease the skids" was appellant's own testimony that he did not intend to request illegal action, J.A. 628, it is implausible that the error (assuming that the exclusion was error at all) "substantially swayed" the judgment. *United States* v. *Brooks*, 111 F.3d 365, 371 (4th Cir. 1997). Therefore, any error was harmless. *Id*.

## III.

Appellant challenges both the enhancement of his sentence under section 2F1.1(b)(8)(B) and the loss calculation that determined his sentencing enhancement under section 2F1.1(b)(1).

## A.

Appellant disputes the district court's conclusion that the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense," yielding a four point enhancement. U.S.S.G. § 2F1.1(b)(8)(B) (2000). Pendergraph argues that only *Centech*, rather than Pendergraph himself, derived the gross receipts. Because this objection was not raised at sentencing, we review it for plain error. *See United States* v. *Grubb*, 11 F.3d 426, 440 (4th Cir. 1993).

Appellant points to *United States* v. *Castellano*, 349 F.3d 483 (7th Cir. 2003), wherein the Seventh Circuit refused to apply section 2F1.1(b)(8)(B) to a defendant who was the founder and principal manager of the corporation receiving the receipts of the offense. *Id*. at 485-86. Although this court has not directly addressed the application of section 2F1.1(b)(8)(B) to a wholly owned corporation such as Centech, it has suggested that application may be appropriate when the defendant owns a controlling interest. *See United States* v. *Colton*, 231 F.3d 890, 911 (4th Cir. 2000) (refusing to attribute corporate receipts to a shareholder under section 2F1.1(b)(8)(B) on the grounds that the defendant "owned *only* a fifty percent — i.e., *noncontrolling* — interest in [the corporation]" (emphasis added)). *See also United States* v. *Stolee*, 172 F.3d 630, 631 (8th Cir. 1999) (upholding the district court's application of section 2F1.1(b)(8)(B) to a defendant who

was the sole owner and president of the corporation that received the fraudulently obtained funds). In light of these authorities, because Pendergraph maintained a controlling interest in the corporation, and thus controlled the fraudulently acquired funds, the district court's decision that an enhancement was appropriate under section 2F1.1(b)(8)(B) was not plain error.

**B.**

Appellant's final claim is that the district court erred by enhancing his sentence based on a finding of $3,000,000 of loss attendant to Pendergraph's scheme. Although we must "accept the findings of fact of the district court unless they are clearly erroneous," *United States* v. *Romer*, 148 F.3d 359, 371 (4th Cir. 1998), we review the district court's interpretation of the term "loss" under the Sentencing Guidelines de novo. *United States* v. *Miller*, 316 F.3d 495, 498 (4th Cir. 2003).

As explained *supra*, Pendergraph's scheme enabled him to fraudulently procure contracts. Therefore, in this case, loss must be calculated in accordance with comment 8(b) to section 2F1.1, which addresses "Fraudulent Loan Application and Contract Procurement Cases." The government appeared to concede as much at oral argument. Comment 8(b) provides that "[i]n fraudulent loan application cases and contract procurement cases, *the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). . . .* However, where the intended loss is greater than the actual loss, the intended loss is to be used." U.S.S.G. § 2F1.1, cmt. n.8(b) (2000) (emphasis added). Here, the loss *had* come about, so the "expected loss" is not the applicable standard. Therefore, Pendergraph's sentence could be enhanced only on a finding of "actual loss" or "intended loss." The PSR calculated the actual loss at $1,431,176.69. J.A. 1067. And the district court found that there was *no* intended loss: "I am not in any way indicating that I thought or think that [Pendergraph] was intending not to build the building. Everything in this case indicates that he was intending to build the building, and to get it done." J.A. 1160. Instead, the district court based its adjustment on the conclusion that the reasonable amount of loss the victim could have faced was $3,000,000. However, in cases where the loss has already materialized, comment 8(b) does not provide for damages

based on the *risk* of loss to which the defendant exposes the victim, but only based on *intended* or *actual* loss.[1] While expected loss might provide evidence of whether the defendant intended any loss, the absence of intended loss renders expectations irrelevant under the guideline. We therefore vacate the sentence imposed by the district court and remand for a determination of the actual loss sustained by the victims of Pendergraph's scheme.[2] In all other respects, the sentence imposed is affirmed.

## CONCLUSION

For the reasons stated herein, appellant's conviction is affirmed. The district court's sentence enhancement of appellant's sentence under guideline 2F1.1(b)(8)(B) is likewise affirmed. However, the sentence is vacated and the case remanded for the determination of actual loss under guideline 2F1.1(b) and resentencing consistent with that determination.

*AFFIRMED IN PART;*
*VACATED AND REMANDED IN PART*

---

[1]In *United States* v. *Baum*, 974 F.2d 496 (4th Cir. 1992), decided under the 1988 version of the guidelines, the court relied on the fact that "although they intended to fully pay off the loan, [defendants] also intended to (and did) induce the lender to unknowingly subject itself to a significant and unappetizing risk — the risk that they would default on the loan," to conclude that "the potential consequences of default . . . best measure the 'loss'" to which the victim was exposed. *Id.* at 499. Section 2F1.1 formerly referred to "estimated, probable, or intended" loss, language which was deleted June 15, 1988. U.S. Sentencing Guidelines Manual app. C, amend. 30. The precursor to comment 8 also referenced "*probable* or intended loss that the defendant was attempting to inflict"; the reference to probable loss was deleted effective November 1, 1991. U.S. Sentencing Guidelines Manual app. C, amend. 393 (emphasis added).

[2]Appellant also filed a supplemental brief claiming that his sentence was enhanced based on factual findings made by the court, in violation of *Blakely* v. *Washington*, 124 S. Ct. 2531 (2004). Because this court has held that *Blakely* did not invalidate the federal sentencing guidelines, this claim is without merit. *United States* v. *Hammoud*, 378 F.3d 426 (4th Cir. 2004).