FILED
United States Court of Appeals
Tenth Circuit

August 10, 2017

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GABRIEL SETH JOSEPH,

    Defendant - Appellant.

No. 16-4109
(D.C. No. 2:15-CR-00103-JNP-BCW-1)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.
_____

Gabriel Joseph purchased a home for $3.4 million through a company that he controlled and then sold it to himself five days later for $7 million. Using the fraudulently inflated value, he received a loan and line of credit from Washington Mutual ("WaMu") totaling $5,659,357.88. After Joseph defaulted, WaMu purchased the property in foreclosure. With an outstanding principal balance of $5,690,725, the property sold for $1.5 million. So Joseph caused what the Sentencing Guidelines and basic economics call, in technical terms, a "loss," but what Joseph calls a wash. Appellant Opening Br. at 15-16. Based on his own understanding of loss, Joseph

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

challenges the district court's 18-level loss enhancement. He also argues that the district court erred in applying a gross-receipts enhancement and in dismissing certain charges without prejudice when the government committed a Speedy Trial Act ("STA") violation. We affirm.

## BACKGROUND

### I. Facts

The facts underlying Joseph's offenses involve one real-estate deal and two limited-liability companies, Annuit Coeptis, LLC and SCIPC, LLC. Joseph and his wife, Shandi, each owned a 50% interest in Annuit Coeptis and Joseph controlled SCIPC, LLC, an acronym for Shandi's Cabin In Park City. On October 11, 2006, SCIPC purchased a cabin (referred to as "Red Hawk") in Park City, Utah for $3.4 million. On October 16, 2006, just five days later, Joseph entered into a real-estate purchase contract to personally buy Red Hawk from SCIPC for $7,000,000.

In February 2007, Joseph requested a mortgage and line of credit from WaMu based on Red Hawk's $7 million purchase price, concealing from WaMu that he controlled SCIPC, had inflated the property's value, and was selling it to himself. He also misrepresented facts about his income and assets and about his intention to occupy Red Hawk as his residence. WaMu approved the loan and gave Joseph a $4,959,586.88 mortgage and a $699,771 line of credit. Because SCIPC was the seller, WaMu deposited $1,983,991.02 of the loan proceeds into SCIPC's account. Joseph then routed about this amount of money through his and Shandi's joint account, Annuit Coeptis's account, and his personal account.

2

Joseph defaulted on the loan. Through a foreclosure sale, WaMu purchased the property. Neither party provided the foreclosure-purchase price. Then, in late 2008, WaMu went into receivership, and the Federal Deposit Insurance Corporation (the "FDIC") seized its assets and liabilities. The FDIC sold the property to JPMorgan Chase, which then sold it for $1.5 million. At the time of this sale, the loan had an outstanding principal balance of $5,690,725.

## II. Charges and Jury Trial

In April 2011, the government brought a two-count Misdemeanor Information, charging Joseph with two counts of willful failure to file tax returns in the 2004 and 2005 tax years, in violation of 26 U.S.C. § 7203. In February 2012, with the misdemeanor case pending, the government also charged Joseph with two felony counts of wire fraud, in violation of 18 U.S.C. § 1343, and one felony count of money laundering, in violation of 18 U.S.C. § 1957. Joseph successfully consolidated the 2011 and 2012 cases (the "Consolidated Case"). The government later obtained a Superseding Indictment in the 2012 case, adding three counts of making false statements to a bank, in violation of 18 U.S.C. § 1014.

In October 2014, three-and-a-half years after the government filed the first charges, Joseph moved to dismiss the Consolidated Case with prejudice for violation of the STA. The government conceded the violation but argued for dismissal without

3

prejudice. In considering whether to dismiss with or without prejudice,[1] the district court concluded that Joseph's offenses were serious, stating that "the Tenth Circuit has recognized that financial crimes, white collar crimes, may constitute serious offenses," and that Joseph's offenses "resulted in a loss of approximately $9,000,000." Appellant App. vol. III at 775. Ultimately, the district court dismissed the charges in the Consolidated Case (which included both the felony and misdemeanor counts) without prejudice.

In February 2015, after the district court's dismissal of the Consolidated Case, the government re-indicted Joseph for two counts of wire fraud, one count of money laundering, three counts of making false statements to a bank, and one count of willfully failing to file an income tax return. The government later dismissed two of the counts for making false statements to a bank. The government also filed a "Notice of Intention to Seek Criminal Forfeiture" under 18 U.S.C. § 982(a). Appellant App. vol. I at 41. A jury convicted Joseph on all five remaining counts, and the district court granted the government's Motion for Order of Forfeiture.

---

[1] "[I]n deciding whether to dismiss an indictment with or without prejudice," the STA requires the district court to balance certain factors. *United States v. Koerber*, 813 F.3d 1262, 1274 (10th Cir. 2016). These include: (1) the seriousness of the offense; (2) any resulting prejudice to the defendant from the delay; (3) the seriousness of the STA violation; and (4) the length of the delay. *Id.*

4

## III.  Sentencing

The probation office prepared a Third Amended Presentence Investigation Report (PSR).[2] The PSR calculated a total offense level of 28 and a criminal-history category of I, rendering an advisory guideline range of 78 to 97 months of imprisonment. The PSR grouped the four convictions for wire fraud, money laundering, and false statements to a bank, and calculated their sentencing impact under U.S. Sentencing Guidelines Manual § 2B1.1 (U.S. Sentencing Comm'n 2015) ("USSG"). For these counts, the PSR set a base offense level of 7, under § 2B1.1(a)(1); added 18 levels for a specific offense characteristic of losses more than $3.5 million, under § 2B1.1(b)(1)(J); and added 2 more levels for Joseph's having derived more than $1 million from financial institutions as part of his offense, under § 2B1.1(b)(16)(A).[3] Then, for Joseph's money-laundering conviction, the PSR turned to USSG § 2S1.1. The base offense level for that crime incorporated the offense level of 27 already calculated from § 2B1.1. *See* USSG § 2S1.1(a)(1). It then added

---

[2] The PSR applied the 2015 edition of the United States Sentencing Commission Guidelines Manual. Here, all references to the Guidelines refer to the 2015 edition.

[3] In June 2007, Joseph secured another loan from WaMu for $3,770,000 based on false information and another in August 2007 for $4,095,000. An earlier version of the PSR included these amounts in Joseph's relevant conduct for loss purposes, yielding a total intended loss of $11,465,000 and actual loss of $7,937,313 (crediting payments Joseph had made toward the loan). But because the district court used actual rather than intended loss and agreed with Joseph that these other transactions should not be included in the total calculation, Joseph's sentence was ultimately calculated using only the Red Hawk loan amounts, saving him 2 offense levels.

5

another offense level because Joseph was convicted for money laundering under 18 U.S.C. § 1957. USSG § 2S1.1(b)(2)(A). That gave Joseph a total offense level of 28.

For the misdemeanor willful-failure-to-file count, the PSR calculated a base-offense level of 16. *See* USSG § 2T1.1; USSG § 2T4.1(F) (providing an offense level of 16 for tax losses of more $100,000 but not more than $250,000). But because this offense level was 12 levels fewer than the money-laundering offense level, the misdemeanor convictions did not increase the total offense level. *See* USSG 3D1.4(c) (disregarding for potential increases any offense group that is 9 or more levels less serious than the other group).

Joseph objected to the PSR's loss calculation as well as its application of the 2-level gross-receipts enhancement. After a sentencing hearing, the district court overruled these objections. Applying the total offense level of 28 and criminal-history category I, the district court imposed a 78-month sentence, the low end of the advisory guideline range, to be followed by 60 months of supervised release, and ordered Joseph to make restitution to the IRS. Joseph appealed.

**DISCUSSION**

Joseph challenges the district court's (1) loss calculation; (2) application of the gross-receipts enhancement; and (3) failure to dismiss the misdemeanor counts with prejudice after the government violated the STA. Generally, we review a sentence's procedural and substantive reasonableness for an abuse of discretion. *United States v. Gordon*, 710 F.3d 1124, 1160 (10th Cir. 2013). "A sentence is procedurally unreasonable if," among other things, "the district court incorrectly calculates . . . the

6

Guidelines sentence . . . [or] relies on clearly erroneous facts." *Id.* (quoting *United States v. Haley*, 529 F.3d 1308, 1311 (10th Cir. 2008)). "Review for substantive reasonableness focuses on 'whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a).'" *United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009) (quoting *Alapizco-Valenzuela*, 546 F.3d 1208, 1215 (10th Cir. 2008)). We also ordinarily review a district court's decision to dismiss an indictment for violation of the STA with or without prejudice for an abuse of discretion. *See United States v. Toombs*, 713 F.3d 1273, 1280 (10th Cir. 2013). But, as discussed below, Joseph has waived our review of this issue.

## I.     Loss Calculation

For economic offenses like Joseph's, the amount of loss heavily influences the total offense level. *See* USSG § 2B1.1(b)(1). Here, the district court found that Joseph's relevant conduct resulted in a $4,190,725 loss, producing an 18-level enhancement under § 2B1.1(b)(1)(J). The district court reached this figure by calculating the "Actual Loss"— defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1 cmt. n.3(A)(i). Pecuniary harm "means harm that is monetary" or "readily measureable in money." *Id.* cmt. n.3(A)(iii). The district court then reduced the amount of loss by the value of the collateral—in other words, it applied the "general formula." *United States v. Smith*, 705 F.3d 1268, 1276 (10th Cir. 2013); *see also United States v. Crowe*, 735 F.3d 1229, 1237 (10th Cir. 2013) (illustrating the loss equation as "actual loss (or intended loss) minus credits against loss"). And, as in this case, when a lender

7

has foreclosed on and sold the collateral, the value of the collateral is the sales price. So, to derive $4,190,725 in loss, the district court reduced the total outstanding balance of the loans at the time of foreclosure (approximately $5,690,000) by Red Hawk's foreclosure-sale price ($1,500,000).

Joseph raises the following four challenges to the district court's loss calculation. He argues that the district court improperly (1) applied the general formula to calculate loss because he asserts that the government failed to prove that any loss resulted from the offenses, and (2) misapplied the Guidelines regarding gain. He also argues that the government failed to prove (3) foreseeability and (4) causation. So Joseph's first two challenges relate to the district court's calculation methodology while the other two relate to its underlying factual findings.

"When a defendant challenges the procedural reasonableness of his sentence by attacking the district court's loss calculation, our task is to determine whether the district court's factual finding of loss caused by the defendant's fraud is clearly erroneous." *Gordon*, 710 F.3d at 1161 (internal brackets omitted) (quoting *United States v. Mullins*, 613 F.3d 1273, 1292 (10th Cir. 2010)). "In other words, 'we may disturb the district court's loss determination—and consequent Guidelines enhancement—only if the court's finding is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made.'" *Id.* (quoting *Mullins*, 613 F.3d at 1292). But we review de novo the district court's loss-calculation methodology. *Id.* We hold that the district court did not err in calculating the amount of

8

loss and that the record supports its factual findings. We begin with the district court's methodology for calculating loss.

### A. Methodology

First, Joseph challenges the district court's methodology based on its use of the general formula. Because WaMu collapsed before it could repackage and sell Joseph's loan to downstream lenders, Joseph asserts that it "never realized a loss or a gain by selling the loan or the underlying property" and that WaMu's closure resulted in a gain for JPMorgan. Appellant Opening Br. at 24. Based on this faulty premise, Joseph asserts that the district court ignored "economic reality" by applying the general formula. *Id.* at 26 (quoting *United States v. Smith*, 951 F.2d 1164, 1167 (10th Cir. 1991)). But the general formula applies as long as it's foreseeable to the defendant that the original lender will sell or repackage a loan. *See Smith*, 705 F.3d at 1276. The rationale for continuing to apply the general formula is that any gains or losses sustained by the original lender will be offset by a corresponding loss or gain by the downstream lender, making the "number of lenders involved . . . *mathematically irrelevant*" to loss calculations. *United States v. James*, 592 F.3d 1109, 1117 (10th Cir. 2010) (Lucero, J., concurring).

Joseph argues that this underlying rationale doesn't apply here because WaMu went into receivership before it could realize a gain or loss on Joseph's loan. But Joseph is wrong. A defunct bank, and certainly its receiver, the FDIC, can suffer a loss. The record shows that Joseph defaulted before WaMu closed and that WaMu purchased the property in foreclosure. Thus, before its closure, WaMu owned an under-secured loan and an overleveraged property. And, after WaMu closed, the FDIC stepped into its shoes

and acquired the loan and property. *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) ("[T]he FDIC as receiver steps into the shoes of the failed S & L, . . . obtaining the rights *of* the insured depository institution that existed prior to receivership.") (internal quotation marks and citations omitted). So, when the FDIC sold WaMu's assets to JPMorgan for "pennies on the dollar," Appellant Opening Br. at 29, it certainly realized a loss. In fact, in another fraudulent-loan case where the lender had gone out of business, we held that the acquirer of the defunct bank could even receive restitution payments because it was a victim. *United States v. Haddock*, 50 F.3d 835, 841 (10th Cir. 1995) ("CNB can properly receive the restitution payments since it acquired the claims of the defunct Bank . . . ."), *abrogated on other grounds by statute*, Mandatory Victims Restitution Act, 18 U.S.C. § 3663A(c)(1), *as recognized in United States v. Cheal*, 389 F.3d 35, 53 (1st Cir. 2004).[4] Therefore, the rationale from *James*—that losses or gains will be offset by corresponding losses or gains to downstream lenders—still applies here. Despite JPMorgan's likely gain, WaMu and/or the FDIC suffered a loss from Joseph's fraudulent activities.

Second, Joseph argues that the district court misapplied the Guidelines by using gain as an alternative measure of loss. The Guidelines allow courts to calculate gain "only if there is a loss but it reasonably cannot be determined." USSG § 2B1.1 cmt. n.

---

[4] For loss-calculation purposes, we similarly reject any argument that we can't consider the FDIC a victim in this case because the government and district court identified only WaMu as a victim. For loss calculations, we focus on the "reasonably foreseeable pecuniary harm that resulted from the offense," USSG § 2B1.1 cmt. n.3(A)(i), not "the *ultimate victim or victims* of [the] offense," *United States v. Snow*, 468 F. App'x 830, 840 (10th Cir. 2012) (unpublished).

3(B). Thus, to calculate gain, the district court must first find that there was a loss. Here, in response to Joseph's objection about actual loss, the district court stated, "if we were to take your position and assume that *there could be no loss*, then I would make an alternative finding that there was gain in an amount that would lead to the same 18-point enhancement." Appellant App. vol. III at 598 (emphasis added).

Joseph is correct that the district court mistakenly implied that it could find gain absent loss. But it's clear that the district court made this statement as an alternative justification for Joseph's § 2B1.1 enhancement. *See id.* (stating "*if* we were to take your position and assume that there could be no loss") (emphasis added). So, unless the district court erred in calculating loss (which it did not) or there was insufficient proof of loss (which there was not), we would not reverse based on a single incorrect statement that didn't impact Joseph's sentence. *See United States v. Romero*, 749 F.3d 900, 906 (10th Cir. 2014) ("[W]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law . . . .") (quoting *United States v. Nicholson*, 721 F.3d 1236, 1246 (10th Cir. 2013)).

## B. Factual Findings

Joseph also argues that the government failed to prove foreseeability and causation. Both challenges implicate factual findings, so we will not reverse absent clear error. *Niemi v. Lasshofer*, 770 F.3d 1331, 1356 (10th Cir. 2014) (stating that a causation argument "implicates the factual findings of the district court"); *Tinkler v. United States*, 982 F.2d 1456, 1469 (10th Cir. 1992) (explaining that foreseeability is a question of fact). We address the two arguments together because they rely on the same mistaken premise.

11

For both arguments, Joseph states that "if Washington Mutual lost any unpaid principal, that principal was lost when the FDIC seized its assets and sold them to JP Morgan Chase." Appellant Opening Br. at 29.

Joseph's argument that WaMu did not lose any unpaid principle until the FDIC's seizure is disingenuous because Joseph had already defaulted on the Red Hawk loan before WaMu collapsed. Joseph argues that because he still owed the unpaid principal balance when WaMu foreclosed, it had not "lost" anything at that time. Appellant Reply Br. at 11. But Joseph didn't continue making loan payments following the foreclosure. Had he, the loss calculation would necessarily have accounted for such payments. *See Smith*, 705 F.3d at 1276 (using the "*outstanding* balance on the loan" to calculate loss) (emphasis added).

But regardless of when WaMu foreclosed, the FDIC absorbed all of WaMu's assets and liabilities, including Joseph's fraudulently inflated loan. So when the FDIC sold the property to JPMorgan "for pennies on the dollar," Appellant Opening Br. at 29, as we said earlier, it certainly suffered from Joseph's acts. Based on the record, we have no trouble concluding that Joseph could foresee that his acts could harm others and that his acts indeed caused such harm. Joseph fraudulently inflated Red Hawk's value by $3.6 million and then used the inflated value to procure a higher loan from WaMu. Further, Joseph's argument that the FDIC's seizure was an unforeseeable, intervening cause is one that we've heard and rejected before. *See e.g.*, *Crowe*, 735 F.3d at 1237 (explaining that the foreseeability at issue is the "potential pecuniary harm that might result from [the] offenses"). And we see no reason here to stray from our view that "it is irrelevant . . .

12

whether or not [the defendant] . . . reasonably anticipated a precipitous decline in the real estate market that might result in the original lender or successor lenders being unable to recoup their losses from the sale of pledged collateral should []he default." *Id.*

## II.    Gross Receipts

Joseph received a 2-level enhancement for "deriv[ing] more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." USSG § 2B1.1(b)(16)(A). Joseph challenges the district court's finding that he derived the funds individually and argues that he used the funds to "satisfy corporate obligations." Appellant Opening Br. at 40 (quoting *United States v. Colton*, 231 F.3d 890, 911 (4th Cir. 2000)). But the record supports the district court's finding.

The district court based its finding for the gross-receipts enhancement on trial evidence, specifically the testimony of IRS Special Agent Ronald Marker. Agent Marker examined Joseph's financial records and tracked the Red Hawk loan proceeds from their initial disbursement and throughout later transfers. A few days after the sale of Red Hawk, SCIPC, as seller, received over $1.9 million from WaMu. An amount close to this then traveled through Annuit Coeptis's account, Joseph and his wife's joint account, and Joseph's individual account. On March 1, 2007, Annuit Coeptis transferred $2,000,020 to Joseph's personal account, which Joseph transferred back to Annuit Coeptis. Marker testified that none of these transfers were possible without WaMu's loan because the accounts had insufficient funds in them.

Joseph admits that the loan proceeds went to his personal account but argues that Marker's analysis never concluded that the proceeds "redounded to Mr. Joseph's personal

13

benefit, as opposed to satisfying the corporate obligations of Annuit Coeptis."[5] Appellant Opening Br. at 19. In support, Joseph relies on a Seventh Circuit case, *United States v. Castellano*, 349 F.3d 483 (7th Cir. 2003), and a Fourth Circuit case, *United States v. Colton*, 231 F.3d 890 (4th Cir. 2000). Both cases held that district courts could not disregard corporate formalities when applying the gross-receipts enhancement. *Castellano*, 349 F.3d at 486; *Colton*, 231 F.3d at 911-12. Both cases are easily distinguishable from Joseph's situation, however, because Joseph individually received a deposit of over $1,000,000 when Annuit Coeptis transferred $2,000,020 to his personal account, whereas the defendants in *Castellano* and *Colton* never personally derived over $1,000,000. In *Castellano*, after a deposit was made to a corporation's account, "[l]ess than $200,000 reached [Castellano] as salary or reimbursement of his expenses." 349 F.3d at 486. Similarly, in *Colton*, a corporation received a deposit of over $1,000,000, but Colton and his coconspirator each received only $300,000 individually. 231 F.3d at 894, 911-12.

Unlike the defendants in *Castellano* and *Colton*, Joseph received over $1,000,000 in gross receipts when Annuit Coeptis transferred $2,000,020 to his personal account.

---

[5] Joseph also argues that Marker never addressed how the initial proceeds were commingled with significant amounts of money in Annuit Coeptis's bank account, such as the $130,086.32 that was in the account on February 26, 2007, when SCIPC initially transferred the loan proceeds to Annuit Coeptis, or another deposit for $200,000. But unless Annuit Coeptis had over $1,000,020 in its account (which Joseph doesn't allege) when it transferred $2,000,020 to Joseph's personal account, it could not have made this transfer without at least $1 million in gross receipts from WaMu. According to Agent Marker, the accounts had insufficient funds to complete the transfers without over $1 million in gross receipts from WaMu.

14

Because of this fact, it's irrelevant that Joseph: (1) received the money from Annuit Coeptis rather than from WaMu directly; (2) transferred it back to Annuit Coeptis; and (3) wasn't the sole owner of either Annuit Coeptis or SCIPC. *See United States v. Monus*, 128 F.3d 376, 397 (6th Cir. 1997) (explaining that the enhancement applies "even if the defendant receives the million dollars in an indirect manner"); *United States v. Bennett*, 161 F.3d 171, 193 (3d Cir. 1998) (explaining that "it is irrelevant how [the defendant] spent the money after he obtained it").

## III.    Speedy Trial Act

Joseph also argues that the district court erred in dismissing without prejudice the misdemeanor willful-failure-to-file-a-tax-return charges, asserting that the district court should have dismissed these charges *with* prejudice because they were not serious. Seriousness of the offense is a factor that courts must consider in deciding whether to dismiss a case with or without prejudice. 18 U.S.C. § 3162(a)(2). The government asserts that Joseph waived this argument by failing to raise it, and we agree.

In the district court, Joseph raised an STA violation and moved for the district court to dismiss the charges against him with prejudice. But in asserting that the charges against him were not serious, Joseph never discussed the misdemeanor charges. Rather, the following excerpt is Joseph's entire argument on the seriousness factor:

> In this case, Mr. Joseph did not threaten or use violence, was not involved in drug distribution, and has no prior criminal history. While in general, any false statements can arguably be "serious," many of the false statement charges here do not have a materiality element. *See United States v. Wells*, 519 U.S. 482 (1997). That means that any minor statement alleged to be false, could be prosecuted as a false statement to a bank. Moreover, the bank making the loans in this case employed little or no underwriting

15

standards, utilized a primary business model of issuing risky Option Arm loans, and ultimately was closed and seized by federal regulators after making thousands of improvident and risky loans which ultimately failed. Simply put, WaMu was willing to loan any potential homeowner or real estate investor money regardless of the risk. *See FDIC v. Killinger* [Case No. 2:11CV00459-MJP (W.D. Wash. 2011)], at 29 (noting how the bank's management was warned of inappropriate Option ARM lending as such loans were made to consumers "with high LTV's [loan-to-value], low FICO's [credit scores], and relaxed debt to income standards (including lack of income verification) . . . .")

The factors identified here would suggest a less serious offense occurred here.

Appellant App. vol. III at 701 (footnote omitted) (brackets in original).

So before the district court, Joseph mentioned the false-statements charges and deflected blame from himself. Now, for the first time on appeal, he argues that the misdemeanor offenses were not serious. While the argument before us is better than the one before the district court, it comes too late. Generally, we consider an argument that "simply wasn't raised before the district court . . . forfeited" and can review it for plain error. *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011). But we treat unraised STA arguments differently. *See United States v. Loughrin*, 710 F.3d 1111, 1121 (10th Cir. 2013).

We have interpreted the STA statute, 18 U.S.C. § 3162(a)(2), "to mean that we may not conduct any review of [STA] arguments unraised below, not even for plain error." *Id.* (quoting *United States v. Seals*, 450 F. App'x 769, 771 (10th Cir. 2011) (unpublished)). This is because the statute "assigns the role of spotting violations of the [STA] to defendants—for the obvious reason that they have the greatest incentive to perform this task." *Id.* (quoting *Zedner v. United States*, 547 U.S. 489, 502-03

16

(2006)). So when a "defendant trie[s] to raise an entirely different [STA] argument" for the first time on appeal, it is waived. *Id.*

Joseph argues that "once a federal claim is properly presented, a party can make any argument in support of that claim; *parties are not limited to the precise arguments they made below.*" Appellant Reply Br. at 24 (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995)). Disregarding the specific waiver rules that apply to unraised STA arguments for a moment, even under our ordinary waiver and forfeiture principles, we have rejected this exact line of reasoning as "spurious." *Fish v. Kobach*, 840 F.3d 710, 730 (10th Cir. 2016) (rejecting the appellant's argument that when "a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below" (quoting *United States v. Johnson*, 821 F.3d 1194, 1199 (10th Cir. 2016))).[6]

---

[6] In any event, Joseph's claim would fail on plain-error review. For plain error, Joseph must show that "(1) the district court erred, (2) the error was plain, (3) the error affected substantial rights, and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Munoz*, 812 F.3d 809, 813 (10th Cir. 2016). Assuming prong-1 error, Joseph certainly fails on prong 2. For an error to be "plain," it must be "clear under current law." *United States v. Olano*, 507 U.S. 725, 734 (1993). An error is clear where "'the Supreme Court or this court [] [has] addressed the issue' or where 'the district court's interpretation was clearly erroneous.'" *United States v. Cordery*, 656 F.3d 1103, 1106 (10th Cir. 2011) (alterations and brackets in original) (quoting *United States v. Ruiz-Gea*, 340 F.3d 1181, 1187 (10th Cir. 2003)). Joseph has failed to present a single case stating that the district court must consider the misdemeanor and felony offenses separately and regard all misdemeanor offenses as not serious.

17

## CONCLUSION

For the reasons stated above, we AFFIRM Joseph's sentence and the district court's dismissal of Joseph's charges without prejudice for the STA violation.

Entered for the Court


Gregory A. Phillips
Circuit Judge